UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CR 09-50 (JMR/SRN)

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S POSITION WITH** |
| vs. | ) | **RESPECT TO SENTENCING FACTORS** |
| | ) | |
| Abdifatah Yusuf Isse, | ) | |
| | ) | |
| Defendant. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The defendant, Abdifatah Yusuf Isse, through and by counsel, takes the following position with respect to sentencing factors, and makes these objections:

Paras. 27 and 28.  The historical predicate is too abbreviated.  What should added is that when the Ethiopian invasion of Somalia began on July 20, 2006, it was supported by the United States.  This was the testimony of Matthew Bryden in the companion case, Draft Transcript at 121, United States v. Mahamud Said Omar.

Applying Aristotle's philosophical analysis of causation – which requires an inquiry as to what caused what to happen, all the way back to uncaused cause of what has occurred – the invasion was brought about by one of two things:  first,

1

the chaos that resulted from a lack of government after 1991. But that, of course, doesn't necessarily explain the Ethiopian invasion in 2006. The second un-caused cause is this: the invasion would never have taken place without financing and support from the United States. Aristotle's method of inquiry is not considered aberrant.

One of the most insightful current articles on this subject is written by Rob Wise, entitled "Al Shabaab," published by the Center for Strategic and International Studies, Case Study Number 2, July 2011, 1800 K. Street NW, Washington, D.C. 20006. Mr. Wise, who does not work for the government, makes the following germane points that should also be added to the PSR and, at the very least, considered at sentencing May 14th.

-The "primary driver" behind the rise of al-Shabaab was the invasion by Ethiopia. Id. at 4. That invasion transformed al-Shabaab "from a rag-tag group of armed thugs into a functional and deadly guerilla army." Id. at 5. Until then, Somalia had been in a "state of perpetual anarchy" at least since 1991, when the military dictator Mohammed Siad Barre was overthrown. Id. at 2.

-Only after 2008, by the time Mr. Isse was long gone, did al-Shabaab undergo its dark transformation. By early 2009, al-Shabaab strengthened ties "to the constellation of al Qaeda affiliates worldwide." Id. at 4.

-It was in February 2010 that al-Shabaab declared it would "connect the

2

horn of Africa Jihad to the one led by al Qaeda and its leader, Sheikh Osama Bin Laden." Id. at 6.  Mr. Isse was here in the United States when this happened, having cooperated with the F.B.I. since February 2009.

Mr. Bryden's trial testimony is consistent.  He viewed al-Shabaab as being a small organization, with about 2,500 to 3,000 fighters.  The chaos of Somalia featured, in Bryden's words, "a lot of different actors fighting for many different reasons."  Transcript at 134.

Para. 31.  We agree that as of February 26, 2008, al-Shabaab was designated as a Foreign Terrorist Organization.  Bryden transcript at 54.  What should be added for emphasis is that Mr. Isse was no longer a part of the camp when the designation occurred.  And that he was unaware of the designation when in Somalia.  In the spirit of fair play, this paragraph should state explicitly the inverse:  "Before February 26, 2008, it was unrealistic for Mr. Isse to know that al-Shabaab was about to become a designated terrorist organization."

Para. 43.  We object to the inference that, ipso facto, Mr. Isse was aware al-Shabaab intended to impose Sharia law "all the way to Jerusalem."  The perverse implication is that Mr. Isse knew or somehow approved of a plan that would essentially wipe out Israel.  Compare Mr. Isse's silent thoughts of escape from the al-Shabaab camp with Egypt's President Morsi's recently discovered declaration of three years ago, which concludes this pleading.

Para. 59.  In the plea agreement, we reserved the issue of whether Mr. Isse played a minor role.  We disagree the PSR's suggestion otherwise.  Addendum, para. 3.  He cut trees at an unmade camp, and then decided to leave.  He didn't do an ambush, shoot at anyone face to face, or try to blow himself up.  He felt lied to from the moment he met with al- Shabaab surrogates in Southeast Minneapolis, at an upstairs room in Davanni's no less, right off I94 and Riverside, near the hospital where patients are healed.  The tag of an "average participant" implies this case is somehow ordinary.  Mr. Isse was a pawn in an international terrorism recruitment scheme not his own making.  By the PSR's own categorization, he was not a "facilitator."

Paras. 93 and 103.  The PSR unfairly overemphasizes a small omission and adds points that in turn multiply years to Mr. Isse's suggested grid.  What the PSR should say is that interviews of Mr. Isse were serial and generated over one-hundred pages of F.B.I. 302's.  His first interview, in Seattle, lasted more than seven hours.  Every time he met with the F.B.I., two to four hours passed by in the windowless room, the questions by nature repetitive, numbing.  Early on, he didn't mention a distant relative.  When questioned further, he disclosed.  His omission did nothing to hinder the F.B.I. investigation.  In fact, it is common for a cooperating witness to limit disclosure early on, until a trust relationship has developed.  The Government's conduct after his correction is telling.  If the

omission were significant, the Government would have ended Mr. Isse's

cooperation.  Nothing stopped the interview process.

Sec. 3C1.1 suggests a two-point level increase only if the defendant

"willfully obstructed or impeded, or attempted to obstruct or impede, the

administration of justice . . ."   The enhancement's reach is "far from automatic."

United States v. Dunnigan, 507 U.S. 87, 98 (1993).  Mr. Isse's testimony had to be

near akin to perjurious.  Id. at 94.  The government has not charged him with

obstruction or perjury and won't because he was allowed to correct what he said.

Moreover, the government was supportive of his testimony at trial.

Responding to the Court's concerns, "I did tell the witness that he should not

guess at the answers to questions and it could be that that's being taken a bit too

literally, but with all respect to Mr. Birrell, I think when he was asked a question

on April the 14th of such and such a year, did you do X, because he doesn't

remember the date he's answering I don't remember.  I think if he's asked a

question of have you ever said S, have you ever done X, the answers would be

different."  Isse Transcript at 111.  This Court was uncertain if Mr. Isse was

dodging.  "I don't know if he is or not. . ."  Isse Transcript at 109.

In a recent federal trial, many of the government's witnesses had lied under

oath in the grand jury, an offense much more significant than not telling about a

relative.  See United States v. Martin, 12-206 (DWF).  There was no effort by the

5

government to preclude the witnesses' testimony.   No indication that, as to the star witness who admitted perjury in the grand jury, the promised 5K motion will be withdrawn.   She won't be charged, either.

Mr. Omar's jury convicted, consistent with Mr. Isse's testimony.   We assumed they believed him.   This much is also true: "Sentencing discretion is like an elevator in that it must run in both directions."   United States v. Cavera, 550 F.3d 180, 194 (2nd Cir. 2010)(en banc).

The cases in this area are sui generis.   The enhancement was affirmed, for example, in United States v. Washington, 318 F.3d 845 (8th Cir. 2003), where the defendant willfully lied as to his whereabouts during a critical day in the drug conspiracy, "inconsistent with the majority of evidence." Id. at 861.   The same result is found in United States v. Brown, where at trial the defendant denied ever knowing a critical witness when he had earlier confessed abundant awareness of that individual's identity and purpose.   539 F.3d 834, 839-40 (8th Cir. 2008).

In United States v. Thurmon, 278 F.3d 790 (8th Cir. 2002), though, the defendant's "accidental inconsistency" between what he said at his plea hearing and his sentencing, did "not rise to the level of objection," and the enhancement was reversed. Id. at 793 (citing Sec. 3C1.1).

If the jury had rejected the government's case, the proposed enhancement would assume a certain palpability.   Compare United States v. Kessler, 321 F.3d

6

699, 703 (8th Cir. 2003)(enhancement affirmed where defendant's testimony

contradicted the witnesses summoned against him).

These two points added unfairly exaggerate how such a wrong is to be

evaluated.  A small misrepresentation in our district has been deemed forth worth

120 days, see PSR para. 18 (describing the disposition of Abdow Munye Abdow,

who lied and was actually convicted) 09-292 (MJD).  Two points equates to three

to sixty months on Mr. Isse's grid.  A stroke of the pen in the PSR suggests an

increase in time far beyond the typical 18 month sentence that results from a

perjury conviction.  Sec. 2J1.2 (base offense 14 assigned to perjury).

Para. 98.  We agreed in the plea agreement to a base offense level, but not

that it necessarily has an empirical basis.  It does not, and we are advocating a

downward departure as a result.  See our comments to paragraph 157, infra.

Paras. 98 and 101.  We object to the terror enhancement, Secs. 2X2.1;

2A1.5.  This issue was reserved in Mr. Isse's plea agreement.  The report makes

no mention of the intensive litigation challenging these twelve points.  Its

application more than triples any prospective sentence, no matter the defendant's

conduct or context.

The enhancement has been been litigated across the land.  One of the most

insightful analyses comes out of Boston, by Judge George O'Toole, Jr., appearing

in the sentencing of United States v. Tarek Mehanna, Crim. No. 09-10017-GAO.

We quote at length.

> . . . the Guidelines at issue in this case have not had a similar frequency of application and, consequently, our collective experience with them is much more limited.

> At least from the perspective of this case to which my attention has been directed, I do not think the guidelines applied in accordance with their terms do an adequately reliable job in balancing the relevant sentencing factor for several reasons: First, the terrorism adjustments that we referred to when we set the Guidelines range operate in a way that is too general to be convincingly reliable in any given case. Both the 12-level adjustment to the offense level and the automatic assignment of a Criminal History Category VI which are applied in any case that can be fairly characterized as a terrorism case, regardless of the particular facts, not only make the recommendation unuseful as a guide in a particular case but is actually, in my view, contrary to and subversive of the mission of the Guidelines which is to address with some particularity the unique facts of the given case. And gross adjustments such as the ones I've referenced do not do that.

> Moreover, the automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have.

> Contrast this situation with the career offender guideline which makes a somewhat similar adjustment. But in that instance the Guidelines make an adjustment to a defendant's criminal history score precisely because he has a certain criminal history. The adjustment to criminal history called for by Section 3A1.4(b) is, I believe, simply a way of "cooking the books" to get to a score and a desired sentencing range, at least as it is applied in the context of this

case.

> So I find the guidelines literally taken, because of those problems
> and perhaps a few others, not to be reliable advice.

Id. at 68-71.

Judge O'Toole also asked his probation office to review all of the terror

enhancement cases.  He found that from 2009 through 2011, "offenders convicted

under 2339B received non-government-sponsored-below-range sentences slightly

more than half the time.  For convictions under 2339A that figure rose to just

above two-thirds.  In cases involving both statutes there are only seven cases, and

six of the seven received non-government-sponsored below-range sentences. . . ."

> As I say, these figures are, admittedly, a non-rigorous analysis,
> but they do suggest that judges faced with sentencing decisions in
> individual cases have not found the Guidelines range helpful in
> establishing the appropriate sentence.

Id.

It's not as if Judge O'Toole is saying something ignoble or irrational.  We

asked that the above quotation be placed in the PSR, a balanced approach which

would have provided authority of another Judge who has faced the same legal

conundrum.  Our PSR remains silent.  See Addendum, at para. 4.

The appellate cases are instructive only to a degree.  The enhancement is to

be applied if there is an actual threat to an established and legitimate government,

and the defendant's conduct was intended to affect that particular government by

means of intimidation and/or coercion.  See generally United States v. Siddiqui,

699 N.W.2d 690, 708-09 (2nd Cir. 20120).  Where, for example, the terrorist

organization has been undoubtedly designated and the defendant knew it and

participated just the same.  United States v. El-Mezain, 664 F.3d 467, 571 (5th Cir.

2011)(terrorism on behalf of HAMAS, an organization with the goal to "rid

Palestine of the Jewish people through violent jihad").  Or where the defendant

adopts a specific organization's ideology to, say, impose Sharia law throughout

the Middle East by removing secular and non-Islamic governments.  United States

v. Jayyoursi, 657 F.3d 1085, 1115 (11th Cir. 2011).

The quality of Mr. Isse's conduct is to be considered in light of other cases,

i.e., similarly situated defendants.  18 U.S.C. 3553 (a)(6).  Compare United States

v. Mohammed, 693 F.3d 192, 2020 (D.C. Cir. 2012)(enhancement affirmed where

defendant loaded missiles into a truck to be used in a terror-related attack) with

United States v. Stewart, 590 F.3rd 93, 138 (2nd Cir. 2009), where the defendant

who translated for the terror-defendant and his lawyer and who had knowledge of

the crime but whose conduct otherwise was passive, was found unworthy of the

enhancement.  The Second Circuit was quite clear that knowledge of others is not

imputed vicariously.

Hence Mr. Isse's desire to abandon the camp cannot be conflated with the

nihilistic thoughts of his co-defendant, e.g. Shirwa's apparent desire to end his

life, or the leaders' efforts to have the innocent blow themselves up while shouting out words of encouragement from the sidelines.

al-Shabaab was considered unique in Somalia for its use of suicide bombers. It was their established method. Bryden Transcript at 80. Mr. Isse wanted no part of it.

There is also a requirement that, before a gigantic enhancement like this one is applied, the defendant had to specifically intend to violate this predicate law. United States v. Handy, 570 F.Supp. 2nd 437, 439 (E.D.N.Y. 2008)(Judge Weinstein noting the necessary link between "blameworthiness" and "a culpable state of mind"); see also United States v. Chandra, 675 F.3d 329, 336-37 (4th Cir.), cert. denied, 133 S.Ct. 609 (2012)(summarizing the detailed proof that the defendant knew the terror organization and its illicit aims).

Mr. Isse ran away from evil. He shouldn't be sentenced as if he stayed.

Para. 105. For the above reasons, we object to the total offense level.

Para. 110. Arbitrarily assuming that Mr. Isse should land within a criminal history of VI is absurd. The terror enhancement overemphasizes, indeed assumes, a criminal history shared by a chronic criminal, the owner of advanced dysfunction. It is, on its face, inaccurate, indeed a lie. An imposed sentence based upon a false fact or false inference runs afoul of due process. Townsend v. Burke, 334 U.S. 736, 740 (1948)(reversing sentence based upon erroneous fact

adverse to the defendant); United States v. Tucker, 404 U.S. 443, 447

(1972)(same).  If the terror enhancement stands, Judge O'Toole's arguments

notwithstanding, we then move, per. Sec. 4A1.3 for a downward departure, infra.

### Grounds for Downward Departure

Whatever the Court's determination of the non-binding guidelines, Mr. Isse

should receive a sentence of time served.  He was released from the Washington

County Jail by Judge Rosenbaum with full knowledge that he no longer needed to

be where he was, in a little cell waiting for an international case to unfold.  Mr.

Isse spent a year behind the bars three years ago, and that was enough.

We have five grounds for departure.  This Court's analysis may end with the

first.

**1. Sec. 5K1.1.**  The prosecution will be sending a detailed letter in this

regard, along with the sealed motion.  The letter will confirm not just Mr. Isse's

trial testimony.  His cooperation began at his arrest of February 24, 2009, at the

airport in Seattle.  He was flown back to Minneapolis on the Government's private

jet, your undersigned appointed.  Mr. Isse agreed to continue, and there began a

series of interviews, none brief.

Most who cooperate in federal court will have one or two sessions, the same

number of trial preparation meetings, and then testify.  For that effort, a Sec.

5K1.1 motion is filed and granted out of course.

Mr. Isse's cooperation has gone on for more than four years.  F.B.I.

interviews occurred on March 1, 2009; March 6, 2009; March 9, 2009; March 10,

2009; March 11, 2009; March 18, 2009; March 20, 2009; March 25, 2009; March

27, 2009; April 1, 2009; April 14, 2009; April 17, 2009; June 9, 2009; July 19,

2009; July 23, 2009; August 11, 2009; September 8, 2009; September 30, 2009;

October 8, 2009; October 12, 2009; October 30, 2009; November 6, 2009;

December 15, 2009; December 29, 2009; January 26, 2010; February 3, 2010;

February 4, 2010; February 9, 2010; March 22, 2010; April 22, 2010; May 11,

2010; June 30, 2010; August 12, 2010; October 13, 2010; October 14, 2010;

November 18, 2010; December 7, 2010; January 11, 2011; February 4, 2011;

March 8, 2011; May 4, 2011; August 1, 2012; September 11, 2012; September 20,

2012; September 22, 2012; September 26, 2012; and after the trial, February 20,

2013; April 8, 2013; and April 11, 2013.

Most of the interviews were several hours, the questions repetitive, detailed,

Mr. Isse polite and patient.  Intelligence agencies from Britain have been brought

in to see Mr. Isse.  The F.B.I.'s colleagues from New York have been here, as have

members of the prosecution team from Manhattan.

Various local prosecutors have either worked directly with Mr. Isse, or have

interviewed him on an independent basis.  In your undersigned's estimation, there

have been at least ten different AUSA's at the meetings.  The original team

handling Mr. Isse's case has not been seen for many years, save one F.B.I. Agent case agent.

No prosecution exists without witnesses.  Mr. Isse provided an on-the-scene-you-were-there rendition of what life was like in Somalia and in the camp, contacts in Mogadishu, in Marka, what happened in Kismayo, the minutia, tea, the meals, the precursor meetings at the mosque, how the funds were raised.  His recruitment, the indoctrination, the nihilistic sensibility, his expected death by gun or suicide.

Mr. Isse represents terror's perverse manipulation.  In a letter sent to the FBI early on, Mr. Isse expressed his remorse, but added that he felt victimized. Remember that Shirwa didn't escape the same camp, and he's dead.  Mr. Isse would have died too.  He's alive, but still a victim.

There are departures and then there are departures.   The cooperation here has been extraordinary, and so should Mr. Isse's departure and sentence be.  All communities are watching.  This Court ought not send the message to the next Mr. Isse that, after thirty debriefings and trial testimony, such an effort was somehow or someway lacking.  Tell him, and the next Somalian, that he made the right decision.

And there are additional mitigating factors.  When considered together, the argument for mercy is overwhelming.

**2. Mr. Isse's diaspora**.  18 U.S.C. 3553 (a).  The Guidelines do not

mention this avenue for relief, except in statutory largess, i.e., a departure has

always been permitted if there are "mitigating circumstance[s] of a kind, or to a

degree, not adequately taken into consideration by the Sentencing Commission."

Sec. 5K2.0.

Mr. Isse was of two worlds, lived in two languages, and decided the

invitation to revisit his original home to be alluring.  His motives were decidedly

mixed.  On the balance he leaned toward reconnecting with his past, his wants and

needs rooted in innocence.

The literature is uniform, the books, the periodicals.  A good place to begin

is with Professor Prina Werbner's article, "The Place which is Diaspora:

Citizenship, Religion and Gender in making of Chaordic Transnationlism,"

Journal of Ethnic and Migration Studies, 28: 1: 119-133 January 2002.  She

makes the following points:

-That for individuals like Mr. Isse – the refugee, the immigrant who has no

choice but to leave – there will always be an attachment to the place of origin.

"[C]ollective historical trauma are still powerfully implicated in the modern

organization of diasporas. " Id. at 120.  The consensus of the scholars "is that

many diasporas are deeply implicated both ideologically and materially in the

nationalist projects of their homelands." Id.

15

-That "the place of diaspora is also a historical location, not merely an abstract, metaphorical space.   Diasporas need to be grasped as deterritorialised imagined communities which conceive of themselves, despite their dispersal, as sharing a collective past and common destiny, and hence also a simultaneity in time." Id. at 121.

-Perhaps most importantly here, diasporas "reproduce and extend themselves without any centralised command structures." Id. at 123.  Put another way, in the state of diaspora there will inevitably be sites of "double and multiple consciousness." Id. at 128.

According to Professor Webner, the problem Mr. Isse confronted was of being in two places and belonging to neither, resulting in a certain loneliness and confusion.  His family was in Seattle.  He attended school in eastern Washington. He knew few people in Minneapolis.  His father was dead.  For Mr. Isse, Professor Webner observes, "[u]ltimately, there is no guiding hand, no command structure, organizing the politics, the protests, the philanthropic drives . . . " Id. at 126.

Professor Webner's work owes a debt to the classic by Professor Benedict Anderson, Imagined Communities, Reflections on the Origin and Spread of Nationalism (Verso 1983).  The professor likewise describes a certain isolation that Mr. Isse experienced, an isolation without the bearings that an individual from a structured society would ordinarily see.  It may be tempting for this Court to

think that Mr. Isse should have acted in a certain expected way, but that would be unfair.  Mr. Isse doesn't have the same structure, gestalt, he doesn't speak the language, the streets are foreign.  It was Professor Anderson who wrote of what a chaortic state brings to the unwary, and how it is viewed by those who have not experienced it:   ". . . nationalism has never produced its own grand thinkers:  no Hobbeses, Tocquevilles, Marxes, or Webers.  This 'emptiness' easily gives rise, among cosmopolitan and polylingual intellectuals, to a certain condescension."  (Emphasis added).

We suggest a different view.  What Mr. Isse lost in Somalia as a refugee youth and sought anew in returning as a young adult was a cohesion.  Researchers call it a "narrative imagining."  That phrase describes "the fundamental instrument of thought.  Rational capacities depend upon it.  It is our chief means of looking into the future, or predicting, of planning, of explaining."  Douglas Rushkoff, Future Shock, When Everything Happens Now (Current 2013) at p. 13 (quoting Marker Turner, The Literary Mind (Oxford University Press, 1998)).  "Without the beginnings and endings, nor the origins and goals offered by linear narratives, we must function instead in the moment."  Id. at 66.

From the moment Mr. Isse went back to Somalia, he experienced a complete loss of structure.  The hoped-for narrative disappeared.

Mr. Isse is still reeling away.  The stroke of last year which almost killed

17

him, the prospect of life-long medication to thin his genetically thick blood, his

mother's failing health, his lack of employment, his soon to be lack of health care

coverage, his life of waiting for this case to end in a small and shared apartment in

near south Minneapolis, his inability to fund return trips to Seattle to be with those

who care about him.

We would like to read the phrase "chaordic state" in this Court's Sentencing

Order.  For there is a difference, surely, between an offense that is one of cunning,

and one centered in personal disintegration.

The camp was symbolic of a cultural miasma.

What Mr. Isse saw was shifting dust.

He decided to leave.

He left.

The abandonment should not continue.  May he return forthwith to Seattle

to be with his brothers, to help his mother, finish college.  This Court should send

him on his way, with hopes that he find what St. Anselm described as the essence

of a good life:  "reason, health, justice, wisdom, truth, goodness, greatness, beauty,

immortality, incorruptibility, immutability, happiness, eternity, power and unity,"

quoted in Larry Witham's The Proof of God (Atlas 2007), at p. 42.

**3.  The delay between the offense and sentencing**.  Four years have passed

since Mr. Isse's Seattle arrest.  Delay is an approved ground for departure.  See

United States v. Muhlenbruch, 682 F.3d 1096, 11110 (8th Cir. 2012)(variance

downward given because defendant's case "had been pending for a long time";

departure affirmed).   The same reason was given for a downward departure in

United States v. Munoz, 11-Cr-167 (JRT)(four year time lag between search and

trial, with the defendant remaining crime free justified downward departure; in

light of a detailed judicial opinion, government declined to appeal).   Mr. Isse's

four year pause is extraordinary.

**4.  The false criminal history**.  As Judge O'Toole observed, the criminal

history score of VI overemphasizes Mr. Isse's clean record, and assumes a lifelong

criminal out of cloth.   Over-counting is an established ground for departure. E.g.

United States v. Gayles, 1 F.3d 735, 739 (8th Cir. 1993); United States v. Shoupe,

35 F.3d 835, 838 (3rd Cir. 1994) (recognizing that the career offender criminal

history enhancement over-represents defendant's record; downward departure

affirmed).

This is particularly true in terror-based cases.  A number of District Court

have concluded that the arbitrary score of VI is indeed an over-representation.

E.g. United States v. Benkahla, 501 F. Supp.2d 748, 759 (E.D.VA 2007)(granting

a departure pursuant to Sec. 4A1.3, and reducing the defendant's criminal history

from VI to I), affirmed, 530 F.3d 300 (4th Cir. 2008); see also Czernicki v. United

States, 270 F. Supp. 391, 393 (S.D.N.Y. 2003); United States v.  Aref, 2007 WL.

804814 (N.E. New York 2007).

The guideline's manipulation of Mr. Isse into a maximum sentence for his count eviscerates the requirement that this Court consider "[t]he nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. 3553(a); accord United States v. Dorvee, 604 F3d. 84, 95 (2nd Cir. 2010).   The Introductory Commentary to Chapter Four of the Sentencing Guidelines, emphasizes that "A defendant's record of past criminal conduct is directly relevant to" assessing his culpability and punishment.  Mr. Isse has a clean record.  That should count.

**5.  The lack of empirical basis**.  There is no empirical basis for both the base offense, and the 12 point enhancement.  The guideline was established by congressional fiat.  Publ Law. No. 103-322.  The minimum offense level of 32 and a criminal history of VI were calculated without any stated reason.  See Guidelines Manual Appendix C, Amendment 539 (directing the Commission to establish the current guidelines for terror-related offenses) and Sec. 3A1.4 (which replaced Sec. 5K2.15).

Kimbrough v. United States, 552 U.S. 85 (2007) holds that if a particular guideline is not based upon "empirical data and national experience," the district court may well conclude that it "yields a sentence 'greater than necessary' to achieve Sec. 3553(a)'s purpose, even in a mine-run case."  Id. at 109.  In Spears v.

<u>United States</u>, the Supreme Court "clarif[ied] that the district courts are entitled to reject and vary categorically from the crack-cocaine guidelines based on a policy disagreement with those guidelines." 555 U.S. 261, 165-66 (2009).

Our disagreement with the terror guidelines should carry just as much weight as the probation office's blanket endorsement to the contrary. For decades drug guidelines were deemed sacrosanct, the probation office's reports suggesting high and higher time for the first offenders. Before <u>Kimbrough</u> and <u>Spears</u> came along, thousands of drug defendants were given unduly long sentences without empirical justification. It happened anyway. If nothing else, the humility caused by past sentencing error leads to the conclusion that future injustice is possible. To believe otherwise is to engage in a sad form of preciousness. There should be abundant caution when the PSR offers the possibility that a long sentence is necessarily the right one.

**6. Mr. Isse's conduct was coerced.** Sec. 5K2.12, the United States Sentencing Guidelines, provides:

> If the defendant committed the offense because of a serious . . . duress under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of the . . . duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. . .

Mr. Isse's duress defense would not have excused his conduct. <u>Dixon v.</u>

United States, 548 U.S. 1, 4 (2006) holds the defense is negated by the

Government's proof that Mr. Isse could have gone to authorities at any time

during his stay in Somalia.  See United States v. Jankowski, 194 F.3d 878, 882-

883 (8th Cir. 1999)(defendant unable to show no real alternative); United States v.

414 F.3d 931, 934 (8th Cir. 2005)(no efforts make to "seek assistance).

   We suppose Mr. Isse could have reached out and talked with his family

who could have approached the F.B.I., but we doubt whether any governmental

agency would have attempted a rescue.  Our armed forces can't just fly helicopters

into Mogadishu and assume a warm welcome.  See Mark Bowden, Black Hawk

Down  (Grove Press 1999); Bryden trans. at p. 35.  Shirwa Ahmed returned to the

camp and died.  Para. 51.

* * * * * * * * * *

This may be a case of international interest.  Yet Mr. Isse's role in global

terror is de minimis.  Compare him to the recently elected Egyptian President,

Mohamed Morsi, who gave a revealing speech three years ago.  He urged the

citizens of Egypt to "nurse our children and our grandchildren on hatred" for the

Jews.  He described the Israelis as "bloodsuckers who attack the Palestinians,

these warmongers, the descendants of apes and pigs."  David D. Kirkpatrick,

"Morsi's Slurs Against Jew Raise Doubts," New York Times, January 15, 2013.

"We must never forget, brothers, to nurse our children and our grandchildren on

hatred for them:  for Zionists, for Jews," he announced on tape.  The children of

Egypt, Morsi added, "must feed on hatred; hatred must continue."  This "hatred

must go on for God and as a form of worshiping him."  <u>Id</u>.   Mr. Morsi has been

asked to make a retraction.  <u>Id</u>.  We ought not be waiting.

Morsi, as an acknowledged member of the Muslim Brotherhood, has long

urged full funding of HAMAS.  <u>See</u> <u>e</u>.<u>g</u>., Jeffrey Fleishman and Reem Abdellatif,

"Egypt's Mohamed Morsi Walks Tightrope in Gaza Conflict," Los Angeles

Times, November 20, 2012.  HAMAS, our laws and cases tell us, is a designated

terrorist organization.  Providing material support to HAMAS is a federal felony.

<u>El-Mezain</u>, 664 F.3d at 571.

Had he lived in New York and had he personally sent money to HAMAS (as

his party no doubt has with his encouragement), Mr. Morsi would be indicted and

convicted by his own words.  At sentencing, the Court would deplore his anti-

Semitism, his insidious dangerousness, the United States would ask for life.

And he is our ally.

Dated: April 19, 2013                     Respectfully submitted,


                                          /s/ Paul Engh

                                          _____

                                          Paul Engh
                                          Suite 1225, 220 S. 6th Street
                                          Minneapolis, MN 55402
                                          612.252.1100

                                          Lawyer for Mr. Isse