UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-050 (01) (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S POSITION |
| v. | ) | WITH RESPECT TO SENTENCING |
| | ) | |
| ABDIFATAH YUSUF ISSE, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota and Assistant United States Attorneys Charles J. Kovats, Jr., John Docherty, and Department of Justice Trial Attorney William M. Narus hereby respectfully submits its position with respect to sentencing of defendant Abdifatah Yusuf Isse ("Isse" or "defendant"). The government anticipates serving and filing a motion for a downward departure pursuant to United States Sentencing Guidelines (hereinafter "U.S.S.G.") § 5K1.1. Absent such a motion, the United States would have believed a guidelines sentence of 180 months' imprisonment to be appropriate, for the reasons set forth below.

## I.    BACKGROUND ON SOMALIA.

At Common Appendix I, the government presents a factual background on Somalia that is relevant to the sentencing proceedings against the following defendants:

*United States v. Mahamud Said Omar,* 09-CR-242 (MJD/FLN)
*United States v. Kamal Said Hassan,* 09-CR-38 (MJD/FLN)
*United States v. Salah Osman Ahmed,* 09-CR-50 (02) (MJD/FLN)
*United States v. Abdifatah Yusuf Isse,* 09-CR-50 (01) (MJD/FLN)

*United States v. Adarus Abdulle Ali,* 09-CR-317 (MJD/FLN)
*United States v. Omer Abdi Mohamed,* 09-CR-352 (MJD/FLN)
*United States v. Ahmed Hussein Mahamud,* 11-CR-191 (MJD/FLN)

This common background is provided as Common Appendix I to the sentencing position papers filed in the each of the cases described above.

## II.     A MINNESOTA PIPELINE OF SUPPORT TO SOMALIA.

At Common Appendix II, the government submits the description of the offenses, defendants, and facts and circumstances describing the conduct at issue. Like Common Appendix I, Common Appendix II is identical in each case described above.

## III.    THE CASE AGAINST THE DEFENDANT, ABDIFATAH YUSUF ISSE.

### A. The Charge of Conviction.

On April 24, 2009, the defendant appeared before then-Chief Judge James M. Rosenbaum and pleaded guilty, pursuant to a written plea agreement, to violating 18 U.S.C. § 2339A(a). In the plea agreement the defendant admitted to providing material support and resources, namely personnel, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons in a foreign country). This offense carries a statutory maximum sentence of 15 years' imprisonment, a maximum term of supervised release of life, a $250,000 fine, and a $100 special assessment.

**B.      The Offense Conduct**

The following description of the defendant's relevant conduct is drawn from three sources: The plea agreement between the United States and the defendant; the defendant's plea colloquy before Chief Judge Rosenbaum on April 24, 2009; and the defendant's testimony at the trial of *United States v. Mahamud Said Omar* (District Court Docket No. 09-242 (MJD/FLN)) which was given on October 4 and 5, 2012.

1.  **The Plea Agreement.**

The factual basis to the plea agreement was legally sufficient but brief: The defendant and the government agreed that "on or about December 8, 2007, the defendant traveled from Minneapolis, Minnesota to Somalia to fight against Ethiopian troops present in Somalia and to cause the Ethiopian troops to withdraw from Somalia." Plea Agreement, paragraph 2.

2.  **The Plea Colloquy and the Defendant's Trial Testimony.**

The defendant's plea colloquy before Judge Rosenbaum was consistent with his trial testimony, although the trial testimony was more detailed.  Blending these two sources of information, and without belaboring the evidence when the Court has observed the defendant's two days of trial testimony, the defendant stated that during Ramadan of 2007, newly arrived in Minneapolis from his home in Seattle, he spent considerable time at the Abu Bakr as Saddique Islamic Center in south Minneapolis, even sleeping there during the last ten days of Ramadan. While at Abu Bakr, the defendant met Abdiweli Yassin Isse (no relation to the defendant). Attachment Three, photograph BB.  After the defendant and Abdiweli Yassin Isse had multiple conversations about traveling to

3

Somalia and waging jihad against the Ethiopians, Abdiweli Yassin Isse introduced the defendant to Ahmed Ali Omar, Attachment Two, photograph 6.

In the mosque, the defendant also met Kamal Hassan, Salah Ahmed, and Khalid Abshir. Although the defendant met several other young men who were part of this case at the mosque during Ramadan of 2007, it was Abdiweli Yassin Isse, Khalid Abshir (Attachment Two, photograph 7), Ahmed Ali Omar, and Omer Abdi Mohamed (Attachment Three, photograph AA) who persuaded the defendant that it was his duty to return to Somalia to protect his country from Ethiopian "invaders." (As noted in Common Appendix I, the Ethiopian Army had actually been invited to enter Somalia by the Transitional Federal Government, in an operation whose support from the international community was evidenced by an enabling resolution from the United Nations Security Council.)

The defendant understood before he left for Somalia, on December 8, 2007, that he was joining al Shabaab, though al Shabaab's true character was only revealed to him bit by bit after he arrived in Somalia. The defendant did understand, however, that al Shabaab had been part of the Islamic Courts Union, and that waging *jihad* meant using weapons and deadly force to make the Ethiopians withdraw from Somalia. Following the route Minneapolis – Amsterdam – Dubai – Djibouti, the defendant, accompanied by Ahmed Ali Omar, Salah Ahmed, and Kamal Hassan, eventually arrived in Hargeisa. After some time in Hargeisa, they traveled to Mogadishu, then proceeded to an al Shabaab safe house in Marka.

4

The safe house was run by "Uma Shabaab" ("the mother of the youth"). The defendant and several other men from Minneapolis spent about two and one-half months in Marka living in Uma Shabaab's house. During his time in Marka, the defendant was told to provide funds for his own AK-47. The defendant was able to do this after participating in fund raising calls back to Minnesota. Near the end of their time in Marka, the men were given some limited training on the use of AK-47s and PKM machine guns. Following Marka, the defendant and his fellow Minnesotans first went farther south, to a safe house in Baarawe, and then farther south yet, to an al Shabaab terrorist training camp in Kamsuma, near the southern Somali city of Kismayo. Before leaving Baarawe, al Shabaab provided the defendant with an AK-47 rifle.

At Kamsuma, the defendant spent about a week clearing brush and otherwise preparing the training camp for use, and encountering senior members of al Shabaab. Fed up with the work, the defendant seized an opportunity to leave when another Minnesotan in the camp, Salah Ahmed, developed a skin condition for which he was allowed to go to Kismayo for medical treatment. From Kismayo, the defendant traveled to northern Somalia, and after spending three months visiting family there, made his way back to the United States.

Back home in Seattle, the defendant spoke by telephone several times with defendant Mahamud Said Omar. Those calls were legally intercepted under the authority of a federal court order, and tapes of the defendant's conversations with Mahamud Said Omar were played for the jury at Mahamud Said Omar's trial. *United States v. Mahamud Said Omar,* Gov. Exs. 88A – 94A (transcripts of English translations). In those calls, the

defendant expressed an interest in returning to Somalia, and received advice from Mahamud Said Omar about practical matters such as which route was best for getting to Somalia, and visa requirements. Defendant Omar also gave defendant Isse contact information for "Uncle Barre" an older al Shabaab member who had met several of the Minnesotans at Mogadishu Airport when they arrived in December 2007 and taken them to the home of "Samatar" (Said Fidhin) the al Shabaab member who was the Minnesotans' pre-departure contact with al Shabaab in Somalia.

### C.   Sentencing Guidelines Calculations

In the plea agreement, the parties agreed that the base offense level under the advisory sentencing guidelines was 33, Plea Agreement at paragraph 6(a), and agreed to disagree over the application of the 12 level increase in base offense level and increase of criminal history to category VI that would apply pursuant to the terrorism enhancement of U.S.S.G. § 3A1.4, Plea Agreement at paragraph 6(b). The government, below, will argue that § 3A1.4 applies; we anticipate that the defendant will argue that it does not. A three level reduction in offense level for acceptance of responsibility, depending on the defendant fulfilling certain conditions, was agreed to be appropriate pursuant to USSG § 3E1.1. As of this writing the defendant has met the criteria described in the plea agreement at paragraph 6(d), and so absent any untoward behavior on the defendant's part between now and sentencing the government will make a motion for a third level reduction in offense level.

The sentencing guidelines calculations in the Report of Presentence Investigation, include, appropriately in the government's view, the terrorism enhancement found at

U.S.S.G. § 3A1.4.  The PSR's sentencing guidelines calculations are in all other ways consistent with those in the plea agreement.  The United States does not have any objections or suggested changes to the sentencing guidelines calculations in the PSR.

The government does have one objection to the PSR.  As to the description of defendant Ahmed Abdulkadir Warsame (charged in the Southern District of New York) located at paragraph 18 of the PSR, the government would like to add that on December 21, 2011, Ahmed Warsame pleaded guilty to all nine counts of the indictment.  The information relating to Ahmed Warsame's pleas of guilty was not available at the time the PSR was published.

## IV.   THE TERRORISM ENHANCEMENT UNDER U.S.S.G. § 3A1.4(a) APPLIES.

The defendant disputes the PSR's correct application of U.S.S.G § 3A1.4(a), the terrorism adjustment, which increases his Offense Level by 12 levels and his Criminal History Category to VI.  The government concurs with the USPO that the terrorism adjustment should apply to this defendant's case.

### 1.    *Text of the Terrorism Enhancement*

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for terrorism.  Section 3A1.4 was amended in 1996 by the Antiterrorism and Effective Death Penalty Act.

Section 3A1.4 states, in pertinent part, that:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

7

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

There are four application notes to Section 3A1.4. Application Note 1 states that the term "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).  Section 2332b states, in pertinent part:

(5) the term "Federal crime of terrorism" means an offense that–

(A)    is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B)    is a violation of –

(i)    . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

Application Note 2 concerns harboring, concealing and obstruction of justice offenses.  It states, "For purposes of this guideline, an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or § 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

Application Note 3, which concerns "Computation of Criminal History Category," provides that, "[u]nder subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI." USSG § 3A1.4 cmt. n.3 (2012).

Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that § 3A1.4 does not require a prerequisite criminal history category VI for its application. Application Note 3 provides for the automatic increase of criminal history to category VI. The increase applies to the § 3A1.4 application notes, except for Application Note 4.

Application Note 4 is a stand-alone provision for upward departure, rather than a Section 3A1.4 adjustment, in cases where the defendant's actions do not meet the definition of "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5). The predetermined increases of offense level and criminal history category that are applicable to § 3A1.4 are not applicable to Application Note 4. The Commission noted that an upward departure rather than a specific guideline adjustment was used because of the infrequency of this type of case and so that the court could assess the harm caused by these offenses on a case-by-case basis.

Viewed in the aggregate, these amendments reflect an understanding by both the Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'"

9

*United States v. Stewart,* 590 F.3d 93, 143 (2nd Cir. 2009) (quoting *Meskini, supra,* 319 F.3d at 92).

### 2.      Two Theories of Application of the Section 3A1.4 Enhancement

The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning.  The United States has not been able to locate any Eighth Circuit precedent on the application of § 3A1.4.

### a.      The "Involve" a Federal Crime of Terrorism Theory

For § 3A1.4 to apply under this prong, the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *and* the offense must be one of those enumerated in § 2332b(g)(5).   The government submits that the Court must determine by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct."  *United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011).  The Court may draw reasonable inferences regarding the intent of defendant's crime based upon the evidence.  *See United States v. Mohammed*, 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming district court's application of the terrorism enhancement where the court "pointed to specific statements in the record – which Mohammed does not dispute he made – from which it [the district

court] drew plausible inferences); *United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of terrorism enhancement where the court "reasonably inferred by a preponderance of the evidence" that the defendant intended to advance Lashkar's terrorist purpose in providing material support to a leader of Lashkar). Although the Eighth Circuit has not considered the issue of whether the district court must make specific factual findings in order to apply the terrorism enhancement, the government assumes for purposes of this sentencing memorandum that that the Eighth Circuit would follow the example of the Fourth Circuit. *See Chandia*, 675 F.3d at 334 (citing *Chandia I*, 514 F.3d 365, 376 (4th Cir. 2008) (if the sentencing court concludes that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").

> i.   ***"Calculated to influence or affect" conduct of government, or to "retaliate against" government conduct***

In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit made clear that for the terrorism enhancement to apply, the law requires a showing only of a specific intent "to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *Awan*, 607 F.3d at 317 (quoting 18 U.S.C. § 2332b(g)(5)).  The Court has been clear, however, that the statute does *not* require "proof of the defendant's particular motive." *Id.*  The defendant's "motive is simply not relevant." *Id.*  "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." *Id.*  By way of example, "a person

who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id.* In a second example, the Court explained, "A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics." *Id.* at 318.

> Thus, the Second Circuit went on to focus on the defendant's knowledge:

>> If the evidence showed that Awan engaged in criminal conduct *with knowledge that confederates solicited his actions* to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object.

*Id.* at 317-18 (emphasis added).

The Court noted that the "calculated to influence" language had been referred to by some courts as the "motivational element." The Court explained that, in fact, "the section is better understood as imposing a requirement that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *Id.* at 317 (citing *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)).

The Eleventh Circuit stated that the Court's analysis "focuses on the intended outcome" of the defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendant's claimed motivation behind it was." *Jayyousi*, 657

F.3d at 1115 (citations omitted); *cf. United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (applying the terrorism enhancement to defendant's conviction for supporting Hamas's fundraising arm because defendant knew Hamas had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal).

> ### ii. *"Conduct of Government" or retaliation for "Government Conduct"*

The "government" affected need not be the government of the United States. Courts have held that a Colombian terrorist group's attempt to influence the government of Colombia met the requirements of the statute. *See United States v. Puerta*, 249 Fed.Appx. 359, 360 (5th Cir. 2007) (*per curiam*) (The court found that § 2332b(g)(5) applied to "Puerta and his co-conspirators [who] sought to trade drugs and money for weapons to supply the United Self Defense Force[s] of Colombia, a designated foreign terrorist organization that opposes the Colombian government."); *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005) (concluding "the word 'government' as used in § 2332b(g)(5)(A) includes foreign governments and is not limited to the government of the United States" and applying the enhancement to a group opposed to the government of Colombia). Courts have also applied the enhancement with respect to Egypt and Pakistan. *See Stewart*, 590 F.3d at 144 (quoting without disapproval the district court's application of the terrorism enhancement to a defendant whose conduct was "calculated to affect the conduct of the Egyptian government though intimidation and coercion"); *United States v. Aref,* No. 04-CR-402, 2007 WL 804814, at 2 (N.D.N.Y.

Mar. 17, 2007) (finding enhancement applied to conduct calculated to influence or affect President of Pakistan).

The Sixth Circuit applied the enhancement to Hizballah's attempts to influence Israel, disregarding a defense argument that Israel no longer constituted a "government" because it was occupying Lebanon in contravention of international law. *United States v. Assi*, 428 Fed. Appx. 570, 574-75 (6th Cir. 2011). There, the defendant was accused of attempting to provide global positioning satellite modules, night vision goggles, and a thermal imaging camera to a terrorist organization, Hizballah. The Court explained, "Surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4." *Id.* at 575.

### iii.    The Offense Need Not Be Violent

In *Assi,* the Sixth Circuit also responded to a defense argument that his crime was not violent. The Court observed that, "Not all of the crimes listed in 18 U.S.C. § 2332b(g)(5)(B) are necessarily violent," citing as examples "1030(a)(1) (relating to protection of computers)," "1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers)," "1361 (relating to government property or contracts)," and "1362 (relating to destruction of communication lines, stations, or systems)." *Assi,* 428 Fed. Appx. At 574. Thus, the Sixth Circuit adhered to the plain language of the statute and found "that a non-violent offense can be a federal crime of terrorism." *Id.* The Sixth Circuit held that the terrorism

14

enhancement was not limited to acts of violence; a nonviolent offense could qualify as a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5).  *Id.*

### b.      The "Intended to Promote" Theory

The Second Circuit has noted that by using the term "intended to promote" the terrorism enhancement casts a "broader net" than the statutory definition alone.  *Stewart,* 590 F.3d at 137.  In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help to bring into being a crime listed in'" the statutory definition.  *Id.* (quoting *United States v. Mandhai*, 374 F.3d 1243, 1247 (11th Cir. 2004).  Thus, the "intended to promote" theory applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism."  Therefore, in order to apply under the "intend to promote" theory of applicability, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)."  *Id.*

The Seventh Circuit has upheld the application of § 3A1.4 in a case under the "intended to promote" theory in *United States v. Ashqar.*  In that case, the defendant was called before a grand jury and advised the grand jury was investigating alleged terrorist acts of Hamas.  *Ashqar*, 582 F.3d at 821.  Once before the grand jury, the defendant refused to answer the questions posed to him by the Assistant United States Attorney.  *Id.* The defendant was subsequently convicted of obstruction of justice and criminal

contempt.[1]  *Id.*  At sentencing, the district court applied § 3A1.4 and sentenced the defendant to 135 months' imprisonment.  *Id.*  In upholding the district court's application of § 3A1.4, the Seventh Circuit held the defendant's conduct before the grand jury, namely obstructing an investigation "can be one way of promoting" a federal crime of terrorism.  *Id.* at 826.  The Court continued,

> Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it.  So long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism, as opposed to an investigation into more ordinary violations of the law, the court has found the intent required to apply § 3A1.4.

*Id.*

### 3.    *Applicability of Section 3A1.4 to the Defendant*

In the present case, the defendant's crime involved a federal crime of terrorism and satisfies the first theory of applicability of § 3A1.4.  First, the defendant was convicted of 18 U.S.C. § 2339A, which is among those offenses listed in 18 U.S.C. § 2332b(g)(5)(A).  Second, the defendant's crime was calculated to influence or affect the conduct of a government, specifically, the government of Ethiopia and the Transitional Federal Government.

### a.    The Defendant's conduct involved an enumerated "Federal Crime of Terrorism" found at § 2332b(g)(5)(B)(i).

On April 24, 2009, defendant Isse entered a guilty plea to Providing Material Support to a conspiracy to murder, kidnap, or maim overseas, in violation of 18 U.S.C. §

---

[1]  The defendant was also charged with a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) based on his refusals to testify but was acquitted of these offenses.  *Ashqar* at 822.

2339A.  According to 18 U.S.C. § 2332b(g)(5)(B), the offense to which the defendant pleaded guilty is a "Federal Crime of Terrorism" and thus satisfies the first element of § 3A1.4.

> **b.    The Defendant's conduct was calculated to influence or affect the conduct of a government by intimidation and coercion and to retaliate against government conduct.**

The defendant's commission of the offense was also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and, therefore, satisfies the second and final element of § 3A1.4.

### i.    Plea Agreement and Plea Colloquy

In his plea agreement, the defendant admitted that "[o]n or about December 8, 2007, the defendant traveled from Minneapolis, Minnesota to Somalia *to fight against Ethiopian troops present in Somalia and to cause the Ethiopian troops to withdraw from Somalia."* (Emphasis supplied).  The italicized language makes plain the defendant's intent to help bring about a change in Ethiopian government policy as to where its armed forces were deployed.

In his plea colloquy before Judge Rosenbaum on April 24, 2009, the defendant expressed his understanding that he was recruited to travel to Somalia "to fight the Ethiopian invaders," Plea Agreement Transcript at page 20.  The defendant also claimed that he hoped to take advantage of the situation to visit family in Somalia, but his actions in Somalia belie this intention, in that the defendant spent considerable time in both Hargeisa and then Marka without making any apparent attempt to contact his family. The defendant only contacted his family in northern Somalia once he had left al

17

Shabaab's Kamsuma terrorist training camp and needed food, shelter, and assistance in making his way home to Seattle.

### ii.    Other evidence

The defendant's actions of accepting some limited weapons training from al Shabaab while still in the Marka safehouse, helping raise funds for the purchase of additional infantry assault rifles, traveling to Kamsuma where he anticipated receiving further terrorism training, listening to lectures on jihad from senior terrorists, and helping clear brush to make possible the construction of the Kamsuma facility, all also speak to an understanding on the defendant's part that his purpose in Somalia was the perpetration of politically-motivated violence.

The history of al Shabaab, summarized in Common Appendix I, and the defendant's acknowledgment that, bit by bit, he learned about the true nature of al Shabaab while in Somalia, is further evidence of the defendant's purpose, his motivation, and his state of knowledge.

The facts demonstrate that the defendant intended to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" (1) when he helped raise funds to facilitate the travel of fighters to join al Shabaab; (2) when he accepted funds, airline tickets, and accommodation for himself in connection with his travel to Somalia to join al Shabaab; (3) when he helped raise funds for the purchase of firearms; (4) when he accepted an AK-47 and training on how to use it: and (5) when he helped bring al Shabaab's Kamsuma training facility to full completion and readiness.

In sum, "element one" is satisfied because the offense for which the defendant was convicted, a violation of 18 U.S.C. § 2339A, is a "federal crime of terrorism." "Element two" is satisfied because the defendant's admitted role in the offense, and his statements and actions, leave no ambiguity regarding his intent to support al Shabaab and al Shabaab's goals, and therefore were intended and calculated "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." As such, the "terrorism adjustment" under § 3A1.4 must apply.

## VI.   ABSENT ANY ADDITIONAL MOTIONS, THE COURT SHOULD SENTENCE THE DEFENDANT TO A GUIDELINE SENTENCE.

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court

19

to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A.   Nature and Circumstances of the Offense.

As described in the plea agreement and PSR, the defendant provided material support to a conspiracy to murder, kidnap, and maim abroad.  He did so in at least three distinct ways.

First, he agreed to travel to Somalia to engage in armed combat against the Ethiopian armed forces for the purpose of expelling those armed forces from Somalia. To make this travel a reality, he joined a group of young men who were raising money from innocent members of Minnesota's Somali-American community.  He did so knowing that the money raised would be used to finance his own travel, and the travel of other young men from Minnesota, to Somalia to fight against the armed forces of Ethiopia.  The defendant helped raise this money by lying about the true purpose for which he was raising the money.

Second, the defendant traveled to Somalia, made contact with al Shabaab representatives, and spent considerable time in al Shabaab safe houses.

Third, while at the Marka safe house, the defendant helped raise money to buy AK-47s for others, and he, himself, accepted both an AK-47 of his own and some training in its use.

Fourth, the defendant traveled to the Kamsuma terrorist training camp, and helped with its construction.

The nature and seriousness of the defendant's crimes, including conspiring to provide support to those who sought to kill Ethiopian soldiers weigh strongly in favor of a Guidelines sentence in this case.  See 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

### B.    History and Characteristics of Defendant.

The defendant testified that he was born in Mogadishu, Somalia, but left Somalia in 1991, at the age of eight, to escape the civil war.   After a year in some refugee camps in Kenya, the defendant and his family relocated to Kampala, Uganda in 1992. The defendant went through the end of middle school (which he testified was equivalent to eighth grade in the American educational system) in Uganda.  After living in Uganda for seven years, he and his family entered the United States in October 1999 as refugees. After living for a while in Phoenix, the defendant and his family moved to Seattle.  In Seattle, the defendant graduated from high school, and completed all but two classes of the work required for a bachelor's degree from the University of Eastern Washington with a major in economics.  The defendant relocated to Minnesota in 2007 because the woman he was dating and thinking of marrying lived here. The defendant has no criminal history other than the crime of conviction in this case, and a single speeding ticket.

When arrested at Seattle-Tacoma International Airport on February 24, 2009, the defendant was on his way to Tanzania.  He immediately agreed to cooperate with the FBI, but at first tried to tell the FBI that he had not visited southern Somalia, but had stayed in northern Somalia for the entire length of his time in Somalia.  The defendant

21

initially said nothing about Marka or other al Shabaab-related topics.   Almost immediately, however, the defendant backtracked and admitted to his conduct.  However, he did not tell the FBI about Abdiweli Yassin Isse for quite a long time because he did not want Abdiweli Yassin Isse to get in trouble. On all other topics, the defendant was forthcoming.  He has been in compliance with his conditions of pretrial release, other than occasions involving inappropriate use of the internet, which resulted in the Court barring him from internet use.  Moreover, the defendant did accept responsibility for his criminal actions by pleading guilty well short of trial.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The defendant committed an extremely serious crime when he knowingly conspired to provide material support to a terrorist conspiracy.   Considering the seriousness of this crime, promoting respect for the law and providing just punishment are important factors in this case.  As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. ___, 130 S.Ct. 2705, 2724 (2010).

Further, although the defendant has no appreciable criminal history and this offense represents his first criminal conviction, his participation in this criminal conspiracy cannot be viewed as a discrete event occurring at a singular place and time. The defendant did not commit a single, impulsive act.  The defendant took one deliberate step after another to provide "material support" – in the form of himself and others - over the course of five months, to a terrorist conspiracy.  In fact, the defendant remained an

active member of the conspiracy for longer than that, as his intercepted telephone conversations with Mahamud Said Omar make clear. In those phone calls the defendant and Mahamud Said Omar are heard speaking positively of al Shabaab and its military successes (including its capture of Marka itself in November of 2008), and discussing ways for travelers to reach Somalia from the United States. The defendant solicited, and received, contact information from Mahamud Said Omar for one of al Shabaab's Mogadishu-based facilitators, "Uncle Barre," and the defendant received updates from Mahamud Said Omar on the progress of the November 2008 travelers.

These facts indicate that a substantial term of imprisonment is necessary to reflect the seriousness of defendant's crime and to promote respect for the law.

> **D.** **The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.**

In this case, there is a need for both individual and general deterrence. Individual deterrence discourages a defendant from ever committing such a crime again. General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Minnesota has seen too many instances of young men traveling to join al Shabaab. General deterrence in this state, at this time, is no small interest. To date, neither the designation of al Shabaab as a foreign terrorist organization nor prosecution of the men

who joined al Shabaab and those who have supported them, have completely stemmed the flow of support to the foreign terrorist organization from Minnesota.  The government respectfully requests the Court strongly consider the impact on both this defendant and the broader community when imposing an appropriate sentence.

Further, the harm that material support to international terrorism causes is of grave concern.  *Holder v. Humanitarian Law Project*, 130 S.Ct. at 2724 (upholding the constitutionality of §2339B: "the Government's interest in combating terrorism is an urgent objective of the highest order.").  A substantial sentence is necessary to deter individuals, like the defendant, from supporting international terrorism.  As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

Id. at 2725.

We reiterate that absent the government's forthcoming motion for a downward departure on the grounds of substantial assistance, a Guidelines sentence would be appropriate in this case.  Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a Guidelines sentence would send a clear message to any would-be jihadists that such conduct is not tolerated by the U.S. government.

**E.      The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.**

On February 24, 2011, in the Eastern District of Virginia, Zachary Adam Chesser was sentenced to 300 months in prison. Chesser pleaded guilty on October 20, 2010 to a three-count criminal Information charging him with (1) communicating threats against the writers of the South Park television show, in violation of 18 U.S.C. § 875; (2) soliciting violent jihadists to desensitize law enforcement, in violation of 18 U.S.C. § 375; and (3) attempting to provide material support to al Shabaab, a designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B.  Chesser was arrested on a criminal complaint on July 21, 2010, charging him with providing material support to al Shabaab, a designated Foreign Terrorist Organization.  On July 10, 2010, Chesser was prevented from boarding a flight from New York to Uganda; Chesser admitted to federal agents that he intended to travel from Uganda to Somalia to join al Shabaab as a foreign fighter.

On March 2, 2012, in the Eastern District of New York, defendant Betim Kaziu was sentenced to 27 years in prison.  His sentence followed a two-week trial in which he was convicted of Conspiring to Kill Abroad, in violation of 18 U.S.C. § 956; Conspiring to Provide Material Support to Terrorism, in violation of 18 U.S.C. § 2339A; Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; and conspiring to use a machine gun in furtherance of those crimes.  The defendant traveled from Brooklyn, New York to Cairo, Egypt, in February 2009 in order to wage violent jihad against United States troops in the Middle East and the Balkans.

While in Cairo, the defendant also attempted to acquire automatic weapons and to travel to Somalia to join al Shabaab.  Ultimately, the defendant traveled to Kosovo in an effort to target American troops stationed there, or to travel onward to Pakistan to join al Qaeda.  While in the Balkans, the defendant recorded a martyrdom video on the Albanian coast of his "last few moments" before he expected to depart for jannah, or the paradise reserved for martyrs.  Shortly thereafter, on August 27, 2009, the defendant was arrested in Kosovo by the Kosovo Police Service.  At the time of his arrest, the defendant had already purchased a ticket to travel to Pakistan on September 15, 2009. Testimony at trial established that the defendant had been radicalized, in part, by Internet speeches by Anwar al-Awlaki and propaganda videos produced by al Qaeda and al Shabaab.

On June 19, 2012, Mohamud Abdi Yusuf received a sentence of 140 months' imprisonment in the Eastern District of Missouri for violating 18 U.S.C. § 2339B.  Yusuf, 31, had admitted to providing approximately $5000 to al Shabaab over a 17-month period.

On December 11, 2012, Nima Yusuf received a sentence of 96 months' imprisonment in the Southern District of California for violating 18 U.S.C. § 2339B. Nima Yusuf admitted sending $1450 to Minnesota fugitives Abdisalan Ali, Cabdulaahi Faarax, Abdiweli Isse, and Mohamed Hassan (described in Part II, B above) while they were in Somalia fighting for al Shabaab.

Also on December 11, 2012, in the Northern District of Illinois, defendant Shaker Masri was sentenced to 118 months' imprisonment after he pleaded guilty to Attempting to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C.

§ 2339B.  Defendant Masri was planning to travel to Somalia in 2010, to engage in combat on behalf of al Shabaab and was arrested hours before his scheduled departure.

On March 27, 2013, defendant Mohamed Ibrahim Ahmed received a sentence of 111 months' imprisonment in the Southern District of New York following pleas of guilty to two violations of 18 U.S.C. § 371.  Specifically, the defendant pleaded guilty to Conspiracy to Provide Material Support to a Foreign Terrorist Organization and Conspiracy to Receive Military-Type Training from a Foreign Terrorist Organization, both in violation of 18 U.S.C. § 371.  In this case, the defendant admitted traveling from his home in Sweden to Somalia in order to join al Shabaab.  While there, he was trained and provided a weapon by al Shabaab.  The defendant also provided 3000 euros (approximately $4000) to al Shabaab.

The Guideline sentencing range for the offense to which the defendant pleaded guilty would be 360-Life but for the limitation provided by the 180-month statutory maximum.  Absent any motion from the government related to the defendant's sentence, the government believes that a sentence of 180 months is appropriate and necessary to account for "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."  18 U.S.C. § 3553(a).

Dated: April 19, 2013                    Respectfully Submitted,

                                         B. TODD JONES
                                         United States Attorney


                                         *s/ John Docherty*

                                         JOHN DOCHERTY
                                         CHARLES J. KOVATS, JR.
                                         Assistant United States Attorneys


                                         *s/ William M. Narus*

                                         WILLIAM M. NARUS
                                         Trial Attorney
                                         United States Department of Justice