UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )
                              )
United States of America,     )   File No. CR-09-50
                              )           (MJD/FLN)
        Plaintiff,            )
                              )
vs.                           )   Minneapolis, Minnesota
                              )   May 14, 2013
Abdifatah Yusuf Isse,         )   10:05 a.m.
                              )
        Defendant.            )
                              )
                              )
------------------------------------------------------------


BEFORE THE HONORABLE MICHAEL J. DAVIS
UNITED STATES DISTRICT COURT JUDGE

**(SENTENCING HEARING)**


Proceedings recorded by mechanical stenography;
transcript produced by computer.


LORI A. SIMPSON, RMR-CRR
(612) 664-5104

1       APPEARANCES

2       For the Plaintiff:        U.S. Attorney's Office
                                  CHARLES J. KOVATS, JR., AUSA
3                                 600 U.S. Courthouse
                                  300 South Fourth Street
4                                 Minneapolis, Minnesota 55415

5                                 U.S. Attorney's Office
                                  JOHN DOCHERTY, AUSA
6                                 Suite 404
                                  316 North Robert Street
7                                 St. Paul, Minnesota 55101

8                                 U.S. Department of Justice
                                  WILLIAM M. NARUS, ESQ.
9                                 Room 1746
                                  950 Pennsylvania Avenue NW
10                                Washington, D.C. 20530

11      For the Defendant:        Paul Engh Law Office
                                  PAUL C. ENGH, ESQ.
12                                Suite 215
                                  220 South Sixth Street
13                                Minneapolis, Minnesota 55402

14      Court Reporter:           LORI A. SIMPSON, RMR-CRR
                                  1005 U.S. Courthouse
15                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1  THE COURT:  Let's call this matter, please.

2  THE CLERK:  The United States of America vs.

3  Abdifatah Yusuf Isse, Criminal Case No. 09-CR-50.  Counsel,

4  will you please state your appearances for the record.

5  MR. DOCHERTY:  Good morning, Your Honor.

6  Assistant U.S. Attorney John Docherty, together with

7  Assistant U.S. Attorney Charles Kovats, Trial Attorney

8  William Narus, and FBI Case Agent Kiann Vandenover, for the

9  United States.

10  THE COURT:  Good morning.

11  MR. KOVATS:  Good morning.

12  MR. ENGH:  Good morning, Your Honor.  Paul Engh on

13  behalf of Mr. Isse.  He is here.  Good morning again.

14  THE COURT:  Good morning.  Please step forward.

15  Counsel, have you had an opportunity to read the presentence

16  investigation report and review that, Mr. Engh, with your

17  client?

18  MR. ENGH:  Yes, I personally reviewed both drafts

19  of the report with him, Your Honor.

20  THE COURT:  For the government, have you had an

21  opportunity to read the report?

22  MR. DOCHERTY:  Yes, Your Honor.

23  THE COURT:  Any objections to the factual

1     statements contained in the presentence investigation

2     report?

3              MR. DOCHERTY:  Not on behalf of the government,

4     Your Honor.

5              MR. ENGH:  Not as to the facts, but as to the

6     conclusions, Your Honor, the legal conclusions, I should

7     say.

8              THE COURT:  All right.  Well, let me hear you.

9              MR. ENGH:  Well, you know, I think you're entitled

10    to accept the PSI.  I would like to argue about these

11    enhancements and make my record as to the enhancements.

12    That's what I was referring to.

13             THE COURT:  I will accept the factual statements

14    contained in the presentence investigation report as its

15    own.  Let's deal with the enhancements and any other issues

16    dealing with the advisory guideline calculations.

17             MR. ENGH:  Your Honor, I had a chance to audit the

18    sentencing yesterday, the first one, so I am familiar with

19    the Court's rulings.  My comments will be in order to

20    protect the record rather than reach the substance of what I

21    think has been decided and what may be the law of the case

22    in all of these cases.

23             I have several objections to the legal conclusions

24    and they are:  Number one, there is a two-point enhancement

25    for obstruction of justice.  The government is not asking

1    for this.  It wasn't contemplated by the plea --

2        THE COURT:  I will grant the defense motion.  That

3    will not be used by the Court.

4        MR. ENGH:  Thank you.  The major or omnibus

5    objection concerns the terror enhancement and the level VI

6    criminal history that's imposed as a result --

7        THE COURT:  I should back up.  I want to make sure

8    the government responds to the two-level enhancement.  My

9    understanding through the papers that I received, the

10   government agrees with the defense on this issue.

11       MR. DOCHERTY:  We do, Your Honor.  At least take

12   no position with respect to it.  It was not something in the

13   plea agreement and it's not something that we argued for.

14       THE COURT:  Okay.

15       MR. ENGH:  That leads us to the terror

16   enhancement, which is the --

17       THE COURT:  I wouldn't want to be reversed because

18   the government didn't have a chance to speak.

19       MR. ENGH:  We wouldn't want that either.

20           In terms of the terror enhancement, Your Honor,

21   the basis of our claim is both as written and as applied.

22   As written we have submitted a detailed memorandum to the

23   Court and I rely on that memorandum of law without further

24   argument.  As applied, however, Mr. Isse's case is slightly

25   different -- or I shouldn't say "slightly different," but is

1    different than the cases yesterday.

2         We look at United States vs. Chandra,

3    C-h-a-n-d-r-a, as a case that imputes an intent element.

4    And the reason Chandra is important here is that the timing

5    of al-Shabaab's designation as a terrorist organization

6    matters.

7         It matters because Mr. Isse had left the camp by

8    the time the designation took place and so there was no way

9    for him to know that al-Shabaab was actually designated

10   before that was publicized.

11        And so his intention, if Chandra is correct,

12   wasn't to necessarily promote a designated terrorist

13   organization, because it had not come into existence as such

14   at that point in time.  That's essentially the argument I

15   have on that.

16        The second problem with the terror enhancement is

17   that it assumes a level VI criminal history, which is out of

18   cloth.  He doesn't have a criminal record and we find that

19   the assumption that he is the worst of all the worst of

20   criminals and has a calculated level of VI to be rather

21   ethereal.  It makes no sense.  It's a predicate that doesn't

22   exist in fact.  It's a legal fiction.  And we rely in large

23   part on the comments of Judge O'Toole and his statements

24   that we reproduced in our brief in that respect.

25        THE COURT:  The government's response?

1           MR. DOCHERTY:  Your Honor, <u>Chandra</u> is really not

2      on point with regard to the case before the Court this

3      morning.

4           The timing of al-Shabaab's designation as a

5      foreign terrorist organization is not material in terms of

6      applying the terrorism enhancement at 3A1.4.  What is

7      required there, and we went into this in great detail in our

8      papers, is that the defendant have committed a federal crime

9      of terrorism.  This defendant has pled guilty to such a

10     crime and that is therefore established.

11          In addition, and what I believe Mr. Engh might

12     also be saying, is that there needs to be evidence in the

13     record of a calculation, not a motive, not an intent, but a

14     calculation to influence government behavior by coercion,

15     intimidation.

16          And the record in this case is absolutely replete

17     with that.  The defendant admitted that he went to

18     Ethiopia -- or went to Somalia in order to fight against

19     Ethiopian troops.  He understood that that would be a

20     violent act.  He understood that the purpose of that was to

21     cause the Ethiopian troops not to stay in Somalia, but

22     instead to withdraw back to Ethiopia, which is an Ethiopian

23     government policy decision.  He also understood that this

24     was contrary to the Transitional Federal Government, which

25     was at that time the internationally-recognized government

1     of Somalia.

2           So for those reasons, Your Honor, we would submit

3     in both the remarks I've made this morning and the far more

4     extensive treatment of this that we've given in our moving

5     papers that the terrorism enhancement of 3A1.4 should, in

6     fact, apply to this case.

7           Thank you.

8           THE COURT:  Thank you.  The Court will apply the

9     terrorism enhancement under 3A1.4(a), which provides for a

10    12-level enhancement for felony offenses that involved or

11    were intended to promote a federal crime of terrorism.

12    3A1.4(b) provides that where subdivision (a) applies, the

13    applicable criminal history category is VI.

14          A federal crime of terrorism is defined as conduct

15    that is calculated to influence or affect the conduct of

16    government by intimidation or coercion or to retaliate

17    against government conduct and is a violation of crimes

18    listed in Title 18, United States Code, Section 2332b(g)(5).

19    The count of conviction in this case, Title 18, United

20    States Code, Section 2339A(a), is listed in Section

21    2332b(g)(5).

22          To determine whether the crime of conviction was

23    calculated to influence, affect, or retaliate against a

24    government, it is not necessary that the defendant was

25    motivated to retaliate, influence, or affect the conduct of

1    a government.

2         The enhancement will apply where there is evidence

3    that the defendant intended to promote a crime calculated to

4    have such an effect, that is, that his offenses were

5    intended to promote a federal crime of terrorism as defined

6    by Section 2332b(g)(5), whatever the defendant's reason for

7    committing them.

8         It should be clear to the Court -- to the lawyers

9    and to the public that this court is a rule of law and I

10   apply the law as it is stated.

11        In addition, it is not necessary that the federal

12   crime of terrorism affected the conduct of the United States

13   or was meant to retaliate against the United States.  People

14   may disagree with this, but this is the law.  The

15   enhancement applies for foreign governments.

16        Further, it is not necessary that the Court make

17   findings as to the legitimacy of the government affected or

18   retaliated against.

19        Based on the evidence in the record, the Court

20   finds that the terrorism enhancement -- and that should be

21   clearly stated in anything that has been written.  It's not

22   the Court's opinion.  It is the law.  Based on the evidence

23   in the record, the Court finds that the terrorism

24   enhancement clearly applies in this case.

25        The facts stipulated to by the defendant in his

1    plea agreement and his trial testimony in the Omar matter

2    demonstrates that the defendant's actions involved or were

3    intended to promote crimes that were calculated to influence

4    or affect the activities of the Ethiopian government and the

5    Transitional Federal Government in Somalia.

6         In his plea agreement the defendant admitted that

7    he traveled to Somalia to fight against Ethiopian troops

8    present in Somalia and to cause the Ethiopian troops to

9    withdraw from Somalia.

10        At trial the defendant provided detailed testimony

11   as to his participation in the charged crimes.  His

12   testimony established that he knew he was joining al-Shabaab

13   before he traveled to Somalia, although he did not learn of

14   al-Shabaab's true character until he arrived in Somalia.  He

15   did understand, however, that al-Shabaab had been part of

16   the Islamic Courts Union and that waging a jihad meant using

17   weapons and deadly force to make the Ethiopians withdraw.

18        The defendant also testified while at a safe house

19   in Marka he raised funds to purchase his own AK-47.  He also

20   received limited weapons training while staying at the safe

21   house.

22        The defendant also spent about a week clearing

23   brush and otherwise preparing a training camp in Kamsuma.

24   When he became disillusioned with this work, the defendant

25   and Salah Ahmed seized an opportunity to leave the camp and

1    the Court will give him credit for that.

2           Based on this and all the other evidence presented

3    at trial, the facts demonstrate that the defendant intended

4    to influence or affect the conduct of the government,

5    Ethiopia and the TFG, by intimidation or coercion or to

6    retaliate against government conduct.

7           All right.  Mr. Engh, next matter.

8           MR. ENGH:  Well, the next matter is I've listed

9    several grounds for a departure.  It seems --

10          THE COURT:  Well, let's not get there.  Is there

11   anything further for the government dealing with any

12   calculations dealing with the guidelines?

13          MR. DOCHERTY:  No, Your Honor.  I mean, there is a

14   motion, but as to the guidelines calculations themselves,

15   no, there is not.

16          THE COURT:  Therefore the total offense level is

17   42, criminal history category of VI, custody of 180 months,

18   supervised release two years to life, fine range of 25,000

19   to 250,000 dollars, and a special assessment of $100.

20          Now, before we get to the other matters, the

21   government has filed with the Court a motion for a downward

22   departure based on the substantial assistance of this

23   defendant for the government under 5K1.1.

24          The government has supplied to the Court an

25   in camera submission that is under seal which has been

1    reviewed I believe by Mr. Engh and so he would understand

2    what the government was submitting to the Court.

3              And Mr. Engh also, I believe, has been told about

4    the *ex parte* meeting that I had with the government

5    yesterday to receive the information that Mr. Engh could not

6    receive --

7              MR. ENGH:  I understand that and I'm aware of

8    that.

9              THE COURT:  -- regarding this defendant.

10             Is there anything that the defense wishes to add

11   to this motion?

12             MR. ENGH:  Well, Your Honor, I guess my preference

13   would be to --

14             THE COURT:  Wrap it all together?

15             MR. ENGH:  Right.

16             THE COURT:  All right.

17             MR. ENGH:  If that would be okay with you?

18             THE COURT:  That's fine.  Is there anything -- let

19   me move to the government.  Is there anything else that the

20   government wishes to add to this motion, to the facts that

21   have been given to the Court regarding this motion?

22             MR. DOCHERTY:  Your Honor, I think that the facts

23   are all laid out in the under-seal submission that we made

24   to the Court.

25             I would simply add that Mr. Isse's cooperation has

1    been of long duration; that it has led to a number of

2    positive results from the government's point of view; that

3    after a brief period at the outset, first in the airport in

4    Seattle and then for the next few weeks when he did not name

5    a couple of people, there have been no issues regarding

6    Mr. Isse's veracity or the completeness of the information

7    that he has provided.

8              Mr. Isse's information -- he came in after

9    Mr. Hassan, who was sentenced yesterday, but after Mr. Isse

10   came in these were no longer going to be one witness cases.

11   And in addition, the events that he related to the agents

12   obviously differed from those given by Mr. Hassan and

13   started the ball rolling that eventually obliged Mr. Hassan

14   to plead guilty to an additional charge.

15             Therefore, I do think that Mr. Isse's cooperation

16   should be recognized and we have made a recommendation in

17   our under-seal submission.

18             Thank you.

19             THE COURT:  The Court will grant the government's

20   motion for a downward departure under 5K1.1.  Now we'll move

21   on.

22             MR. ENGH:  Okay.  I would like to address the

23   merits of the sentence and at least my view of what has

24   happened in the last four years and offer a suggestion to

25   you as to what we think would be just and right, with full

1      knowledge that the decision is yours to make.

2              I first met Mr. Isse almost four and a half years

3      ago.  That's longer than almost any case that has existed in

4      this district.  He was a young, frightened 22-year-old from

5      Seattle and he had been arrested at the Seattle airport.

6              If my memory is correct after four years, he was

7      put in Oak Park Heights for a few days and then we -- I was

8      appointed and then he resided in the Stillwater jail,

9      Washington County jail, for almost a year.  And he was

10     eventually released from a halfway house -- or to a halfway

11     house for three months and then was released on his own.  We

12     entered a plea in front of Judge Rosenbaum, of course.

13             But I say that the time distance matters because

14     in speaking with him over the years, the uncertainty of

15     waiting is in a sense punishment.  We have in our lives a

16     sense of structure that we want.  I can speak for myself, I

17     guess, no one else, but we seek structure, we seek love, we

18     seek comfort, we seek something to look forward to.

19             And for the last four and a half years he's been

20     in this kind of no zone of waiting.  And one can say, well,

21     it's your fault you're waiting, but on the other hand, the

22     nature of terror cases, the nature of their investigation,

23     the nature of bringing people over from Netherlands, you

24     know, makes it for a much longer process, but still he waits

25     and he's on hold.

1           What has been steadfast for him is the love of his

2    family.  I do want to point out that his two brothers are

3    here.  If you could stand up, the two brothers.  His mother

4    flew in from -- Amina, if you would stand up.  His mother

5    came from Seattle -- she doesn't speak English -- last

6    night.  And the balance of the family.  Roda, the sister, is

7    right there.  And then we have some relatives from -- elders

8    from the family as well.  And so I did want to thank them

9    all for coming and flying in last night.  Their love for him

10   has been steadfast.

11           THE COURT:  I want one of them to be the

12   spokesperson and come forward and talk on behalf of your

13   client.

14           MR. ENGH:  I would be happy to -- I think his

15   older brother would like that.  He asked me if he could and

16   I didn't know if he could.  Okay.

17           THE COURT:  All you had to do is ask me.

18           MR. ENGH:  Well, I know the question -- I know the

19   answer now.

20           You know, I've been to Seattle to see the family

21   twice.  We've met in the coffee shops there downtown.  The

22   family has been allowed to visit him.  When all of this was

23   much a secret, we would have these meetings at the U.S.

24   Attorney's Office on the fifth floor and the Justice

25   Department was kind enough to allow the family to come in

1    and have tea.  We would eat, and I would stay and watch the

2    interaction and there's just an abiding sense of love for

3    him.

4            The question that came up yesterday, I suppose, is

5    if you're from such a nice family and everyone loves you so

6    much, why did you error like you did.  And this is always

7    the question in law and it's always the question in criminal

8    law.  And I think the answer is, if I may be so bold to

9    accept it, is that we are imperfect beings and even the best

10   families can have a derailment.

11           I see this over and over again in my family, the

12   one child or one sibling or one parent is just -- totally

13   messes up and everybody else is extraordinary.  So you have

14   these meetings where people are working and they have

15   careers and they're brilliant and then one person falls

16   away, and it happens.

17           And so the issue is not so much to explain it, but

18   I think to recognize the imperfection of human nature, the

19   ability to fall down.  And I think the other thing to

20   recognize is that we do have in law and in life chances to

21   redeem ourselves.

22           And what this case really is about, at least from

23   my point of view, is his redemption.  His family hasn't

24   given up on him.  The government never gave up on him.  I

25   would hope that you would not give up on him by giving him a

1    long term.

2            The debriefings were extraordinary.  I've never

3    seen anything like this.  By my accounting there were 50

4    meetings.  Every one of them was two to four hours.  He was

5    steadfast in his accuracy.  His memory was unbelievably

6    good.  He became critical to the government's case.

7            You know, it's fairly obvious in law that the

8    government can't win a case or even present a case without

9    witnesses and he became a willing witness for them, an

10   imperfect witness.  And everybody who cooperates is

11   imperfect.  They wouldn't be in trouble if they weren't

12   imperfect.  But we put people like Mr. Isse on the stand and

13   they're cross-examined and he testified.

14           I guess what I want to ask the Court is what kind

15   of paradigm or what message do we want to send to the future

16   Mr. Isses.

17           I mean, the old paradigm when I got his case was

18   this:  You cooperate as much as possible.  The more you do,

19   the better off you are.  And if you're central and critical,

20   you'll get a tremendous sentence because of your need.  And

21   that has been the paradigm of cooperation, for better or for

22   worse, for the last 20 years.

23           And so the advice that I gave him, not that it's

24   privileged, but it's common, is come to the meetings, be on

25   time, say what you want, never rush out, keep going, keep

1    going even if the end is not terribly clear for you.

2           And the message, I think, to send is that if you

3    are a critical witness in an international case and you come

4    forward and cooperate, you will be rewarded because of the

5    guts it takes and because of the danger you face afterwards.

6    And I think that should be the message here, that it should

7    be extraordinary cooperation should yield an extraordinary

8    sentence.

9           And I take issue with the government's approach in

10   the sense they think it's worth 10 levels, we think a

11   percentage decrease is suitable.  You know, we're not Iowa.

12   That's what they do down there.  If you cooperate you get

13   two points here, you get four pints here.  They try to

14   quantify the unquantifiable there.  And other states, too,

15   in the Eighth Circuit.  But in this state we don't do that.

16          It's a subjective judgment and I would ask you to

17   not quantify it by a percentage of 55 percent or 60 percent

18   or 40 percent, but quantify it by what is extraordinary,

19   which is difficult to do.

20          I note that the jury accepted his testimony,

21   however imperfect it was.  And I know the Court had some

22   concerns about him and I have read the transcripts, but they

23   did accept his testimony.

24          You know, once he got out on bond he worked two

25   jobs.  He was responsive.  You know, then he had some health

1    concerns.  I still remember being summoned to the hospital.

2    You know, all of a sudden on a Monday night I'm going to

3    Fairview Hospital to see Abdi all plugged in with tubes

4    because he's had a stroke at age 23 or 24 because his blood

5    is genetically thick.

6            And he could have died, but thankfully they gave

7    him good care and he made it, but it's been quite a journey

8    for him.  I mean, I still remember sitting in the hospital

9    with his sister talking to him when he's totally vulnerable,

10   as he always has been, and then he made it.

11           One of the -- not only is his blood thickening now

12   while he's in jail, but, you know, his mother is in dire

13   straits.  She's on dialysis.  I'm thrilled that she could be

14   here.  She has to go back tomorrow.

15           The medical literature on dialysis is that if you

16   don't get a transplant, you've got big problems.  The

17   doctors in that area don't speak for a long expectancy of

18   life.  So she's waiting for a transplant, if one will come.

19   And that's important because he would like to go home to be

20   with her, to care with her -- to be a caregiver for her.

21           And the theme of all literature and all cases like

22   this one is that we want to go home somewhere, wherever it

23   is.  And one of the reasons he went to Somalia is he wanted

24   to go home.  He was raised there.  He belonged in two

25   places.  I cite the literature to you, but it just makes

 1     intuitive sense.  We always want to go where we came from,

 2     for better or for worse.  And now he's from Seattle.  He

 3     can't go back to Somalia.  He would be killed.  So he would

 4     like to go back to Seattle and help her.

 5              I think what has always troubled me about this

 6     case is that it's -- and I am almost done -- it's the

 7     intersection between the amorphous nature of a country that

 8     has no laws and is chaotic and the intersection of the

 9     United States laws which are settled and clear, as the Court

10     has ruled.

11              And so he was in a dialectic of sorts of going

12     into this chaotic life in Somalia that had no structure,

13     leaving a structure that was never his own perhaps at birth.

14     And he found it confusing, he found it distant, and he found

15     it someplace where he had to leave quickly.

16              I think of this case and I think of all the

17     interviews and the hundreds of pages of 302s and the days of

18     testimony and I think sometimes we make things more complex

19     than they should be.  I think sometimes that the better

20     explanation is the simpler explanation.

21              I think -- I would ask the Court to consider

22     applying Occam's Razor, the philosophical edict that the

23     simpler explanation should be used instead of the more

24     complex.

25              And the simplest explanation and why Occam is

1    important is that it's almost four sentences that you could

2    use here.  One, I left the country.  I stayed in a camp for

3    six days.  I didn't like it is the third sentence.  The

4    fourth is I left.  And the fifth, of course, is I came back

5    and cooperated.

6            And I know there's a lot of nuances and I know

7    there are houses over there and I know there are e-mails and

8    I know all these things, but that is what happened to him.

9    It's a six-day visit to a jihadist camp where he said no

10   more, I'm done, I'm out of here, and he never came back.

11           And he's lucky.  He's lucky -- we are all lucky

12   sometimes to be where we are.  He's lucky he had a family

13   who could fly him back from northern Somalia.  Otherwise

14   he's dead.

15           So this is a bittersweet day for him and for me, I

16   suppose.  Part of his life he's messed up, his 20s are gone,

17   but he's here, he has a life, and he has a certain nobility

18   because he is alive.  And I would ask you to recognize that

19   and give him a lenient sentence.

20           THE COURT:  Why don't you have his brother come

21   forward.

22           MR. ENGH:  Ahmed.

23           THE COURT:  Why don't you have a seat.

24           Good morning.

25           AHMED ISSE:  Good morning, Your Honor.

1          THE COURT:  Would you state your name for the

2     record.

3          AHMED ISSE:  My name is Ahmed Isse.  I'm the older

4     brother of Abdifatah.

5          THE COURT:  And would you spell your name for the

6     record.

7          AHMED ISSE:  First name is A-h-m-e-d, Ahmed.  And

8     of course last name is I-s-s-e.

9          THE COURT:  All right.

10         AHMED ISSE:  We just flew from Seattle last night.

11    We come here.

12         THE COURT:  Thank you for coming.

13         AHMED ISSE:  Yeah, we have to.  My mom actually

14    supposed to have dialysis today, which she has to, but

15    because of what's going on with [indiscernible] she has to

16    miss it.  She will not be able to get it tomorrow.  The next

17    chance will be Friday.  So she will be missing four days of

18    dialysis.  The main thing is, you know, she's an older

19    person and a hard time --

20         THE COURT:  Watch that.  She's not as old as I am.

21         AHMED ISSE:  You know, that's true, but also

22    health consideration makes a person age.

23         And the thing we just want to request from you is

24    Abdifatah, when he left us from Seattle, I mean, the main

25    thing he left was actually to come here.  He was engaged

1   with a girl and he was about to finish his school.  I think

2   he had only a few degrees [sic] left from his undergraduate

3   degree.  And we were thinking, hey, he's going to be there a

4   few weeks or whatever, meet her family.  And the next thing

5   we heard was Abdifatah is in Somalia.  We couldn't actually

6   believe it.

7        And soon after we first heard of it he told us, I

8   want to get out.  Can you please help me out here.  And

9   that's when we tried -- you know, call family, friends back

10  home, try whatever we can to get him out.  I mean, we were

11  lucky to have him out and many other young kids were not

12  that lucky and are not here, of course, today.

13        So we really didn't believe it at the beginning.

14  We didn't even -- when we get the call we didn't believe

15  this is from Somalia.

16        So we just want Your Honor to consider that and to

17  consider he never had any issue with family or law anywhere.

18  This is his, I would say, first mistake and biggest mistake,

19  probably, for the rest of his life.

20        One of the things young people do is always,

21  especially at that age, before they settle down and marry,

22  they tend to not -- they react too fast.  I mean, not all

23  people, of course, are the same, but you will see a lot of,

24  you know, youngers doing something they shouldn't be doing,

25  whether it's drunk driving or whatever.

1          So he's not the person he was when he left.  He's

2     another person than when he was growing up.  He age.  He

3     matured.  He learned from his mistakes.  And that's almost

4     like ten years of his time almost gone because of that.

5          And family -- we would like to speak in the name

6     of the family.  We would like you to consider that and help

7     him at least stay with his mother.  She's alone.  Whenever

8     she comes out from dialysis, basically she cannot do

9     anything.  She's weak, she has migraines, and she needs

10    somebody to be around her, make for her food, and at least

11    be around in case she needs something.  The way we are right

12    now, he's the best person to be there in that kind of

13    situation, help her out.

14         The conclusion basically is we would like Your

15    Honor to be lenient on him.  And whatever, you know, he did,

16    he help the government a lot and I guess he cooperated as

17    much as anybody could.  Basically that's what the family is

18    requesting from you.

19              THE COURT:  May I ask you a couple questions?

20              AHMED ISSE:  Sure, sir.

21              THE COURT:  Now, you work for Microsoft?

22              AHMED ISSE:  I work for a company that works with

23    Microsoft and that company is called [indiscernible].

24              THE COURT:  What are you, a computer guru?

25              AHMED ISSE:  I'm a software engineer.

1          THE COURT:  Now, how old were you when you came to

2     the United States?

3          AHMED ISSE:  When I came to the United States we

4     were, of course, refugees and Somalia has been at that time

5     almost ten years in civil war.  So we were really happy that

6     the government, United States government, give us this

7     opportunity.  We went to schools.  We graduated.

8          THE COURT:  When did you -- what year did you come

9     to the United States?

10          AHMED ISSE:  We came to -- 1999.

11          THE COURT:  And were you in Kenya or Uganda?

12          AHMED ISSE:  We were in Uganda.

13          THE COURT:  And you were in a refugee camp?

14          AHMED ISSE:  We were -- yeah, there was a refugee

15     camp.  First there was no refugee camp and then we have to

16     go to refugee camp.  They make one for refugees from

17     Somalia.

18          THE COURT:  And for the record, why don't you

19     describe the conditions of the refugee camp.

20          AHMED ISSE:  The refugee camps in that part of the

21     world, it has very -- only necessities in life.  There

22     weren't so much of buildings to talk about and no health

23     care.  As a matter of fact, in the first months of being

24     there a lot of people lost their lives because of

25     preventable diseases and that's through mosquito or water,

1     issues with water.  So, I mean, the people who --

2          THE COURT:  That's good for you to talk about that

3     because yesterday several people talked about coming to the

4     United States and being thankful for clean water.

5          AHMED ISSE:  Exactly.

6          THE COURT:  And for most Americans, they wouldn't

7     even understand that issue.  So I want you to put on the

8     record exactly what is happening in the refugee camp and

9     what you had to suffer through.

10          AHMED ISSE:  I will say I remember just waking up

11     in the morning and the first thing a person probably will be

12     doing is opening the tap water, which used to come from a

13     lake nearby.  And if you look at the water, the only thing

14     you would see is like dark.  Instead of clear water, you

15     would see almost like it's come from engine or car engine.

16     I mean, I don't know whatever you boil -- the water, that

17     water is not healthy.

18          And then you have the environmental issues, which

19     were mosquitos, snakes, ants that literally if they come to

20     your house in the night, they would go over -- all over your

21     body and then start biting one time and the only chance a

22     person have is to take [indiscernible] as soon as possible.

23     So there were all these kind of issues together.

24          THE COURT:  And how long were you in the refugee

25     camp?

1          AHMED ISSE:  I will say -- I don't really remember

2     how many it was, but I know it's more than -- it was years.

3          THE COURT:  And then you came to the United

4     States?

5          AHMED ISSE:  We came -- Your Honor, I didn't hear.

6          THE COURT:  You came to the United States?

7          AHMED ISSE:  Yeah, exactly, from these refugee

8     camps.

9          THE COURT:  And do you remember how old you were

10    when you -- in 1999?

11         AHMED ISSE:  I probably was in my early 20s.  I

12    probably have to keep counting the numbers, but I was early

13    20s at that time.

14         THE COURT:  And how old was your brother?

15         AHMED ISSE:  He was way younger, of course, like

16    seven years old.

17         THE COURT:  How old -- if you can remember, how

18    old was he when he left to go to the refugee camp from

19    Somalia?

20         AHMED ISSE:  Basically when we left Somalia he was

21    a baby.  I would say at that time he was over 10 years old,

22    12, I would say.

23         So he grow up, you know, thinking that he's from

24    Somalia, but in reality he had always divided kind of --

25    what can I say?  He always -- I mean, basically what I'm

1    trying to say is he has conflict.  You know, he never grew

2    up being from one country.  Like if you are in Somalia,

3    you're Somali.  If you grow up here, you're here.  He always

4    was like half something, half refugee from Somalia, half

5    other nationality.

6           So he always used to be -- I mean, I understand

7    why, for example, he would think maybe Somalia is good, it's

8    this, because in reality when he grow up when he left he

9    didn't see -- he didn't have the real picture of how

10   Somalia's situation was.  So he may have kind of a romantic

11   kind of -- I don't know.  Some --

12          THE COURT:  Romantic viewpoint of the homeland?

13          AHMED ISSE:  Basically.

14          THE COURT:  But he would have known and I suspect

15   that your family talked about the problems that you had to

16   go through to get to the United States?

17          AHMED ISSE:  Yeah, of course, but since he wasn't

18   really in the part of feeling the way it was -- I mean, when

19   you're a kid you always have somebody older than you

20   supporting you, so he had -- we lost our father like 1993

21   before we -- after we left Somalia and so we always had

22   somebody older around him.

23          THE COURT:  Now, you've mentioned that your family

24   was surprised that he would have gone to Somalia.

25          AHMED ISSE:  Exactly, because for one reason.  We

1    were thinking he's engaged and telling us when the wedding

2    day is.  For second, most of our family, his siblings are

3    here.  So we were not expecting he would go back to Somalia

4    basically for people he may have never seen or he may have

5    seen when he was young.

6                 THE COURT:  And you're Sunni?

7                 AHMED ISSE:  Yeah.  In Somalia we don't have Shia

8    or Sunni, so we just say we are all the same.

9                 THE COURT:  All right.  And how religious was your

10   family?

11                AHMED ISSE:  I would say we are a typical Somali

12   family.

13                THE COURT:  Help me out with that.  What's a

14   typical Somali family like?

15                AHMED ISSE:  A typical Somali family is a family

16   that basically fill up their daily life, goes to mosque

17   maybe once a week.  It depends probably on the person.  Some

18   of our siblings don't even go to mosque or pray.  Some of us

19   do pray.  So that's basically the typical Somali family.

20                THE COURT:  And did your family ever talk about

21   the Islamists?

22                AHMED ISSE:  Since they -- we have been talking

23   about it since we heard that he left, so yes.

24                THE COURT:  And was your brother involved in those

25   conversations or listening to them?

1        AHMED ISSE:  No.  I mean, I went to Eastern

2    University, which I also graduate, for his graduation

3    ceremony or walking ceremony.  And anybody knew from his

4    friends or even me, it was literally -- I mean, far away

5    from anything about religious.  The friends he had, all of

6    them I would say were American, other nationalities, Asian,

7    everybody.  I don't think, even, he used to pray when he was

8    there.  So if he was something, it wasn't religious.

9        And that was one of the other things that actually

10   surprise us, because a person like that within a few weeks

11   of thinking that he is going to tell us the wedding date or

12   something like that, to hear he is calling from Somalia,

13   it's different.  It's something that's almost unexpected.

14       THE COURT:  And I know that you have thought about

15   it many a night and --

16       AHMED ISSE:  Of course.  It's been a nightmare.

17       THE COURT:  It's a nightmare for me because I

18   can't figure it out either.  And I keep asking and I've been

19   asking for years, what in such a short period of time --

20       AHMED ISSE:  Yeah.  I mean, the only thing that

21   comes to my mind is something must have happened when he

22   come here to Minneapolis.  The reason he left and the reason

23   what he did after, his life was almost like polar opposites

24   of each other.  So I don't think he had intention of doing

25   anything like that when he was coming here or almost

1     100 percent.

2             So I would put that into the picture of maybe

3     Minneapolis environment, being kind of a kid at that time,

4     and also the human nature.  We all, I guess -- people always

5     make mistakes, big ones or small ones.

6             THE COURT:  Had your family had any historical

7     run-ins with the Ethiopians where they have taken your land

8     or killed any of your relatives over the years because of

9     different wars that had occurred?

10            AHMED ISSE:  There was -- Ethiopia and Somalia,

11     they have a little bit long history.  There have been some

12     wars going on between the two nations since the last three

13     centuries or so.

14             And one of the things that happened was during the

15     [indiscernible] some lands of Somalia where Somali people

16     live was occupied by Ethiopian government.  So national --

17     Somali national government before the civil war used to

18     always try to encourage people, you know, to be

19     nationalists, get the land from Ethiopia and so on.

20             So there was some wars, in 1977 and before that,

21     because of that.  So there was this issue of Somali

22     nationalism concerning the land they think is occupied by

23     Ethiopian government.

24             THE COURT:  And was your family involved in any of

25     those wars?

1          AHMED ISSE:  No, none.

2          THE COURT:  But you knew about them and --

3          AHMED ISSE:  There was -- this is historical fact,

4     yeah, there's wars that have been -- I think the biggest one

5     was the 1970s.  So there's those wars.  But in terms of

6     family, we had nothing, no -- none of my people I know ever

7     participated.

8          THE COURT:  Is there anything else that you want

9     to tell me?

10          AHMED ISSE:  I will just say again that we request

11     your leniency, Your Honor, not only for him, but for my mom,

12     for us.  It's been really tremendous years that we have

13     spent thinking -- I mean, our life is kind of stuck because

14     of this situation.  So that's all we are saying.

15          THE COURT:  I appreciate that.  Thank you.

16          Step forward.  Are you finished with your --

17          MR. ENGH:  I have said my piece.  Thank you.

18          THE COURT:  Mr. Isse.

19          THE DEFENDANT:  Thank you, Your Honor.  I just

20     want to say I appreciate the Court's consideration of my

21     case and I want to say I'm really sorry I went back to

22     Somalia.  I shouldn't have done that.

23          Somalia was once my home and by going back, you

24     know, I already accept the responsibility in what I have

25     done.  Since I came back I have attempted to make things

1    right by cooperating with the government.  I have done the

2    best I could for the past three or four years.

3           Also I want to thank my brother and -- my

4    brothers, my mom, and the rest of the family for being here

5    today with me.

6           I want to say, Your Honor, that -- ask for mercy

7    today and I promise you I will never be in trouble again and

8    do such thing that I did before and I want to ask you to

9    please let me go back to Seattle, start over life, finish my

10   school, and take care of my mother.

11          Thank you.

12          THE COURT:  Anything for the government?

13          MR. DOCHERTY:  Yes, Your Honor.  Your Honor, I've

14   taken some of the exhibits from the Omar trial and

15   renumbered them as exhibits for this sentencing proceeding.

16   As you can see, except for the first few, they're not

17   terribly visual and so I don't see the need to use the

18   camera and put them up.

19          In Mr. Engh's remarks, Your Honor, he stated that

20   the case could be reduced to four sentences and it was

21   essentially he went to Somalia, he cleared brush, he got

22   disaffected, he left.  That was also in the defendant's

23   opening sentencing position.  And in our response we, to

24   some extent, took the defense to task for that because it is

25   so incomplete as to be untrue.

1          Mr. Isse participated in meetings here in

2     Minneapolis.  He traveled to Somalia.  We accept that he did

3     not know the true nature of al-Shabaab or at least not in

4     all of its detail at the time that he departed, but he has

5     said and we accept that bit by bit in Somalia he learned of

6     al-Shabaab's nature.

7          He got to Hargeisa.  He learned a little bit, but

8     he did not leave.  He got to Mogadishu.  Certainly learned

9     quite a bit more in just one night in that safe house in

10    Mogadishu, but did not leave.  Instead went to Marka.

11         He spent some time in Marka, I think it was

12    probably more than approximately two months, of playing

13    soccer, of going to Internet cafes.  As Mr. Bryden

14    testified, of course this was the period when the recruits

15    from Minnesota were under observation by the organization to

16    make sure that they could be trusted and brought in.  And

17    also while in Marka Mr. Isse helped to raise funds by

18    getting on the telephone to raise funds for an AK-47.

19         And then when they moved to the next safe house in

20    Baraawe, Mr. Isse accepted from al-Shabaab an AK-47.  And

21    that is one of the exhibits that we have here, Exhibit

22    Number 7, which is a photograph of the AK-47.  He was shown

23    a series of photographs of different types of AK-47s by an

24    agent of the Bureau of Alcohol, Tobacco, Firearms, and

25    Explosives and this is the one that was most like his and

1    that's why his initials, "AS," are on Sentencing Exhibit 7.

2         Also in the packet before you are a couple of

3    photographs, Numbers 4 and 5, of Mr. Isse at the house in

4    Marka and the well-known, by this point, photographic

5    spreads of all the travelers and all the people in Somalia

6    connected with this case.

7         Eventually -- and like the Court, the government

8    gives Mr. Isse credit that after a week of clearing brush

9    and when things were no longer playing soccer on the beach

10   Mr. Isse became disenchanted and Mr. Isse left.  He went to

11   northern Somalia.  He stayed there for some period of time.

12        He returned to the United States and in evidence

13   at the Omar trial we heard a number of telephone

14   conversations in which Mr. Isse and the defendant, Mr. Omar,

15   participated.

16        And in those conversations Mr. Isse is quite plain

17   about wanting contact information for people in Somalia and

18   Mr. Omar gives him contact information for Uncle Barre, the

19   al-Shabaab facilitator who met men from Minnesota at the

20   Mogadishu airport and took them to Samatar's safe house in

21   the city of Mogadishu.

22        Mr. Isse inquires after a man he identifies as

23   Mustaf, which is the kunya, the name of Ahmed Ali Omar, and

24   Mahamud Said Omar replies he is doing fine, I sent him a

25   hundred dollars the day before yesterday.  Mr. Isse inquires

1    about visas and about travel routes.

2              Eventually Mr. Isse, as we know, was arrested

3    on February 24, 2009 at the Seattle-Tacoma Airport while

4    on his way to board the initial flight for a trip to

5    Tanzania.

6              So to say that this is a case where Mr. Isse went

7    over, spent six days, got disenchanted, and came home leaves

8    out an awful lot.

9              Now, that being said, the cooperation in this case

10   has been very helpful to the government.  It has been very

11   longstanding.  It has included spending what must have been

12   at least uncomfortable couple of days in that witness stand

13   face-to-face with a defendant in a federal courtroom.

14             It is worthy of recognition and it is worthy of

15   generous recognition and that is why in our papers we are,

16   as Mr. Engh has said, recommending a 10-level reduction in

17   offense level as a result of the 5K1.1 motion, resulting in

18   an advisory guidelines sentence of 70 to 87 months.

19             If the Court has questions, I will be happy to do

20   my best to answer them, but otherwise that concludes my

21   remarks.

22             THE COURT:  Thank you.

23             Any objections to Exhibits -- Sentencing

24   Exhibits 1 through 14?

25             MR. ENGH:  No.

1          THE COURT:  They will be admitted.

2          On April 24, 2009 the defendant pled guilty to

3     Count 1 of a four-count indictment charging him with

4     providing material support to terrorists, in violation of

5     Title 18, United States Code, Section 2339A(a), a Class C

6     felony.  It is considered and adjudged that the defendant is

7     guilty of that offense.

8          The Court has gone over the advisory guideline

9     range and that is 180 months or 15 years in prison.  The

10    Court has granted the government's motion for a downward

11    departure based on substantial assistance to the government.

12    The Court has read the presentence investigation report.

13         Mr. Isse, step forward.  Look at me.  Look at me.

14    You have to look at me.  I have got to see you.

15         The Court has read the presentence investigation

16    report and all the submissions that have been submitted on

17    both the government and the defense behalf.

18         The Court has read the in camera submission

19    dealing with the 5K1.1 and had other information given to it

20    regarding the substantial assistance that was given by this

21    defendant and all other defendants that have received 5Ks.

22         The Court has heard arguments of counsel in court.

23    The Court has heard from the brother of the defendant.  The

24    Court has reviewed all the pertinent United States Supreme

25    Court decisions dealing with sentencing and also the Eighth

1    Circuit Court of Appeals decisions dealing with sentencing

2    and will apply the factors under Title 18, 3553(a), and will

3    sentence the defendant as follows:

4         The defendant is hereby sentenced to the care and

5    custody of the Bureau of Prisons for a term of 36 months.

6         There is no fine.

7         The defendant is sentenced to a term of 20 years,

8    20 years of supervised release.  The following mandatory

9    conditions are applicable:

10         The defendant must report to the United States

11   Probation and Pretrial Services Office in the district to

12   which the defendant is released within 72 hours of release

13   from the custody of the Bureau of Prisons.

14         The defendant shall not commit any crimes,

15   federal, state, or local.

16         Mandatory drug testing is suspended based on the

17   Court's determination that the defendant poses a low risk of

18   substantial assistance -- a low risk of future substance

19   abuse.

20         Next, the defendant shall not possess a firearm,

21   ammunition, destructive device, or any other dangerous

22   weapon.

23         Next, the defendant shall cooperate in the

24   collection of DNA as directed by the probation officer.

25         Next, the defendant shall abide by the standard

1    conditions of supervised release that have been adopted by

2    the Court, including the following special conditions:

3         The defendant shall comply with all immigration

4    rules and regulations and if deported from this country,

5    either voluntarily or involuntarily, not re-enter the United

6    States illegally.  Upon any re-entry to the United States

7    during the period of court-ordered supervision, the

8    defendant shall report to the nearest United States

9    Probation and Pretrial Services Office within 72 hours.

10        If not employed at a regular lawful occupation as

11   deemed appropriate by the probation officer, the defendant

12   may be required to perform up to 20 hours of community

13   service per week until employed.  The defendant may also

14   participate in training, counseling, daily job search, or

15   other employment-related activities as directed by the

16   probation officer.

17        Next, the defendant shall submit his person,

18   residence, office, vehicle, or other area under the

19   defendant's control to a search conducted by the United

20   States Probation Office or supervised designee at a

21   reasonable time and in a reasonable manner based upon

22   reasonable suspicion of contraband or evidence of a

23   supervision violation.  The defendant shall warn any other

24   residents or third parties that the premises and areas under

25   the defendant's control may be subject to searches pursuant

1    to this condition.

2         Next, there's a $100 special assessment which is

3    payable to the Crime Victims Fund, which is due and payable

4    immediately.

5         Sir, if you feel the Court has not followed the

6    law in the imposition of your sentence, you have a right to

7    appeal your sentence to the Eighth Circuit Court of Appeals,

8    which sits in St. Louis, Missouri.  You have 14 days from

9    today's date to file your notice of appeal.

10        Mr. Engh will be your attorney on that appeal.  If

11   you do not wish to have Mr. Engh, I will not appoint another

12   attorney to represent you.  You will have to hire your own

13   attorney or represent yourself.

14        Now, it should be noted that when he gets out of

15   prison and if he's not deported and he stays in the country,

16   I want high supervision over him.

17        And so you understand, Mr. Isse, we can talk about

18   empirical studies and everything else about how one goes

19   about sentencing.  You messed up a little bit on your

20   supervised release and I put you back in jail, but I'm going

21   to take a chance on you.  When you walked away, when you

22   devised a scheme to get away, that told me a lot about you.

23   If you had been involved in the ambush, you would be doing a

24   lot of time.

25        And you have the support, as most of the young men

1    that are coming before me, have the support of your family,

2    who have sacrificed so much for you to survive and thrive in

3    a new country.  And we can't forget that.  You can't forget

4    that.

5            It's so easy for young people to get caught up in

6    their own little world.  As your brother said, they

7    protected you.  You probably got the best food in the camp

8    because you're the youngest.  They made your world seem

9    normal so you wouldn't go through the harsh sacrifices that

10   they had to go through.  Anybody who has ever been to or

11   seen a refugee camp in Africa, it's almost as worse as being

12   dead.

13           You've got a lot to live up to now.  And if I'm

14   wrong about you, it's on my end.

15           Anything further for the government?

16           MR. DOCHERTY:  Your Honor, there is still

17   technically open a supervised release -- or a pretrial

18   release violation that has not gone to final hearing.  In

19   light of the disposition of this case, I would ask that that

20   be closed with no further action.  If the Court feels

21   differently, I would ask for a moment to consult with the

22   probation officer.

23           THE COURT:  I'm going to close it and dismiss it.

24   It's not necessary to have a hearing on it.

25           MR. ENGH:  Your Honor, then just a couple of

1    requests.  I know he's in jail, Mr. Isse is, but he's asked

2    me if he could somehow someway have a furlough so that he

3    can tidy up his business and say hi to his family and then

4    surrender in two weeks, if that would be at all possible.

5          And then the alternate request is that he now is

6    in Ramsey County.  I'm not sure why he's there, but he would

7    appreciate the chance to go to Washington County where he

8    started his journey.

9          Those are my two requests.

10          THE COURT:  Give me a 30-day date.

11          THE CLERK:  June 14th.

12          THE COURT:  Sir, I'm going to release you on the

13    conditions that you were on before.  Were you on a bracelet?

14          THE DEFENDANT:  No.

15          THE COURT:  Let's put him on a bracelet.  And you

16    are to follow the conditions that you were on on release and

17    to not violate any of them and turn yourself in to the

18    Bureau of Prisons' designated place of confinement on

19    June 14th, at 12:00 noon, 2013, whatever prison they

20    designate for you.

21          If they have not designated a prison for you,

22    you are to turn yourself in to the United States Marshals

23    Office in Seattle, Washington, at 12:00 noon on that date,

24    June 14th, at 12:00 noon, 2013.

25          MR. ENGH:  And we would appreciate a designation

1   suggesting Washington or the Pacific Northwest.

2           THE COURT:  So ordered.

3           Ahmed?

4           AHMED ISSE:  Yes.

5           THE COURT:  You've got responsibility of your

6   brother.

7           AHMED ISSE:  We will try our best.

8           THE COURT:  And thank you for coming.

9           Anything further?

10          MR. DOCHERTY:  No.

11          THE DEFENDANT:  Thank you, Your Honor.

12      (Court adjourned at 11:16 a.m.)

13                          *     *     *

14

15

16

17

18

19      I, Lori A. Simpson, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23          Certified by:  *s/ Lori A. Simpson*

24                          Lori A. Simpson, RMR-CRR

25